WILSON *v.* STATE OF INDIANA.

[No. 30,522. Filed June 13, 1966.]

*Olsen & Niederhaus,* of Evansville, and *Robert H. Rideout,* of Boonville, for appellant.

*John J. Dillon,* Attorney General, and *Wilma T. Leach* and *Douglas B. McFadden,* Deputy Attorneys General, for appellee.

ARTERBURN, J.—The appellant was charged with the crime of murder in the first degree, filed an answer of insanity, pleaded not guilty and was found guilty of murder in the second degree. He was sentenced to imprisonment in the state prison for life.

The assignment of errors states:

1. The court erred in overruling the appellant's motion for a new trial.
2. The court erred in overruling appellant's motion to quash.
3. The court erred in allowing the State to amend the indictment.

Under Rule 2-6 of this Court, the latter two separate specifications are not proper assignments of error unless presented as items in the motion for a new trial. Rule 2-6 provides in substance that any error relied upon, "however and whenever arising up to the time of filing of such motion" (motion for a new trial), if relied upon as error on appeal, must be assigned in the motion for a new trial. Items 2 and 3 therefore are not before us for consideration on appeal.

We come to the consideration of the items in the motion for a new trial presented to us on this appeal. It is first urged that the court erred in overruling defendant's motion to suppress certain evidence obtained in a search of the decedent's home, which the appellant claims was his home temporarily.

Briefly, the evidence shows that the appellant went to the apartment of the decedent, looking for Ruth Miller. This was

on Saturday, January 21, 1962 in the evening. He and the decedent started drinking and both got into a quarrel or argument about Ruth Miller and started fighting. The appellant struck the decedent with his fist and with a skillet, apparently injuring him, and he put him in bed. The next morning the decedent was suffering and groaning and the appellant said he decided to put him out of his misery and turned on the gas. When he returned a few hours later the decedent was still alive so he stabbed him three times, but did not kill him. The next morning, Monday, January 23, he finally shot the decedent. He said he held a gun to the decedent's head and pulled the trigger.

A motion to suppress evidence as to State's exhibits 10-A, B, C and D and State's exhibit 11 was made during the trial. The court heard this evidence and overruled it. In the first place, the brief in the discussion of this motion does not set out what the State's exhibits were and in what way, if at all, they were prejudicial to the appellant. It is claimed these exhibits were obtained by the unlawful search of the decedent's premises at the time he was found dead in his apartment.

The trial court heard the evidence, which briefly showed that Officer Basham, while on duty on January 23, had a call that an accident had taken place on Mary Street at the decedent's own apartment. When he got there he was told to go upstairs. This was about 9:00 a.m. He had no search warrant and was making no arrest at the time. The evidence does show that the appellant also lived at another home in the City of Evansville. Appellant stated he had just recently returned to Evansville and decedent had invited him to spend "the week end" at the decedent's apartment. The court had to determine from the evidence the fact as to whether appellant was merely a transient by invitation at decedent's home when he killed him or was a resident thereof, immune against an unauthorized search. There was sufficient evidence for the court to conclude that appellant was only a temporary

visitor on the evening of the drinking and fighting. The evidence also shows the officer was invited into the premises by some one in charge after decedent was found dead as the result of violence.

In our opinion, it would be an absurd interpretation of the law to say that a police officer informed of a homicide, should first have to obtain a search warrant to visit the apartment or home where the victim of the killing lay dead. Certainly the law does not hamstring the normal and emergency activities of police officers in their attempt to apprehend criminals to that extent. Alertness and promptness are to be commended on the part of law enforcement officers.

In this case a man lay dead as a result of violence inflicted upon him in his own apartment. Any police officer who sees or is informed of such a condition has not only the right, but the duty, to make an instant and prompt investigation. To say that someone, a visitor, who was temporarily on the premises by invitation at the time of the death of the victim, thereby acquires a constitutional right to insist upon a search warrant being first procured—while he flees from the scene, as in this case—is stretching constitutional interpretation to an absurdity.

Too frequently we over-emphasize the technical interpretation of a constitutional provision and overlook the major objective of the instrument, namely the protection of the public against internal and external enemies. The preamble to the Indiana Constitution states it was ordained ". . . that justice be established, [and] public order maintained, . . .;" the United States Constitution to ". . . establish justice, insure domestic tranquility, . . ." Law-abiding citizens are entitled to the protection of the Constitution against the criminal elements in society to as great, if not greater extent than the criminal. Too frequently we forget constitutional rights of citizens and victims of crime who constitute the public, thinking only of the criminal's rights,

to the injury and breakdown of the effective enforcement of the law and to the detriment of "domestic tranquility" and "public order" as ordered by the Constitutions.

Courts have had their difficulties in this field in defining the laws of search and seizure and balancing the public's right to protection against crime as against the rights of privacy of the individual.

Whether a guest of the owner of the premises may complain about an illegal search of a room in which he is staying has been a confusing question for the courts. *McDonald* v. *United States* (1948), 335 U. S. 451, 69 S. Ct. 191, 93 L. Ed. 153; *In re: Nassetta* (1942), 125 F. 2d 924 (2d Cir.); *Gibson* v. *United States* (1945), 80 U. S. App. D. C. 81, 149 F. 2d 381 (D. C. Cir.).

To designate such a person as a casual visitor or a temporary visitor or a guest is not an answer or aid in laying down a very definite rule in such situations involving search and seizure. However, regardless of how we characterize the appellant's occupancy of the room in question on the night of the murder, we find whatever right he had in objecting to a search was certainly terminated by his own actions, namely, the killing of his host and the possessor of the premises to which he was invited and his fleeing and abandoning the premises after the killing. The invitation of the decedent had also ended with the termination of "the week end."

In *Abel* v. *United States* (1960), 362 U. S. 217, 80 S. Ct. 683, 4 L. Ed. 2d 668 the court held that after the occupant of a hotel room had left, a search by the FBI of a wastebasket in the room and the discovery of material evidence was legal.

We find in the case of *Feguer* v. *United States* (1962), 302 F. 2d 214 (8 Cir.), cert. denied 371 U. S. 872, 83 S. Ct. 123, 9 L. Ed. 2d 110, that a like search of a room previously occupied and vacated by a defendant following a murder was legal.

See: Annot., 86 A. L. R. 2d 984, 993 (1962).

A person present by invitation, or as a temporary visitor, does not acquire rights in the premises against search after he has killed his invitor or host and has fled the premises. Certainly there could be no more final manner of terminating the invitation and visit and forfeiting all rights of occupancy than in the manner described.

In *Vanover* v. *Commonwealth* (Ky.) (1951), 237 S. W. 2d 539, 542, in a situation much the same as here in a homicide case, the court said:

> ". . . Though these men had taken over this apartment as their hideout or as guests, it is very certain that the next day when the search was made they had surrendered whatever possession they had obtained by intrusion. Their things were not searched; they were simply found. There is no merit whatever in this contention."

The trial court did not err in overruling the motion to suppress the evidence.

The next contention made by the appellant is that the court erred in permitting

> "a four page handwritten document, . . . purportedly and allegedly written by the defendant to be introduced into evidence over the objections of the defendant after the defendant had shown evidence which proved the documents to be incompetent, and said evidence was uncontradicted by the State."

and further:

> "the court permitted to be introduced into evidence a typed one page document, . . . which was not the product of the defendant and was therefore incompetent."

The specification in the motion for a new trial does not identify the exhibits referred to by the number or letter or any other fashion under which they were designated at the trial, nor does the motion set out specifically the objections, but only states in general terms that they were "incompetent." In referring to the argument section of the brief where these points were taken up, it is there

contended that the court committed error in permitting "the introduction into evidence of State's Exhibits 10-A, B, C, D and 11." These particular exhibits, we are to assume, are those referred to in the motion for a new trial. Neither do we have the specific objection set forth in the argument section of the brief. The rules of this Court require that objections to the introduction of evidence must be specific and not general. 1 Flanagan, Indiana Trial and Appellate Practice, Sec. 1993, p. 485; 8 I. L. E., Criminal Law, Sec. 372, p. 421.

It has been frequently said by this Court that the argument section of the brief must adequately present the specific error with the specific objections, properly related to and identified with the motion for a new trial. This Court is not required to search the transcript in order to identify and properly consider any alleged error. For the reasons stated, we are unable to give consideration to the points urged.

Incidentally, we may say, however, that a plea of insanity was offered by the appellant in this case. It has been repeatedly held that a plea of insanity opens wide the door to all evidence relating to the defendant and his environment. In many instances evidence would not otherwise be competent or material except for showing the mental condition or mental state of the defendant. Under the circumstances in this case, we find no error committed by the court in the admission of the evidence complained of. *Shipman* v. *State* (1962), 243 Ind. 245, 183 N. E. 2d 823, cert. denied 371 U. S. 958, 83 S. Ct. 515, 9 L. Ed. 2d 504; *Kallas* v. *State* (1949), 227 Ind. 103, 83 N. E. 2d 769; *Blume* v. *State* (1900), 154 Ind. 343, 56 N. E. 771.

The next error alleged in the motion for a new trial is that the court erred in refusing to give appellant's tendered instructions 6, 28, 30, 31, 32, 34 and 37. The appellant does not set out these instructions verbatim in the argument section of the brief. However, it is stated

that they concerned the subject of intoxication of the appellant and instructed the jury that a specific intent was necessary to be proved before the defendant could be convicted of first or second degree murder. The State in its brief sets forth appellant's tendered instruction 24, which was given. Assuming the tendered instructions refused were as stated, we find the court committed no error in refusing to give them in view of the giving of the above instruction No. 24 tendered by the appellant.

Instructions 34 and 37 tendered by the appellant are not set out in the argument section of the brief, but it is stated that they pertain to the confession admitted as State's Exhibit No. 11. It is contended that the tendered instruction stated that if the instrument (Exhibit No. 11) was in words and language that the defendant could not have understood, then it should be disregarded by the jury. The court did give appellant's tendered instructions 35 and 36, which the State sets forth verbatim in the argument section of its brief.

We find the court covered the subject matter adequately. There was no error in the refusal to give instructions 34 and 37 tendered by the appellant, assuming their content was correctly stated.

The contention is further made that the court erred in refusing to give appellant's instruction number 6, which also is not set out verbatim in appellant's argument section of the brief. It is stated there, however, that this instruction "covers the subject of reasonable doubt and provides that in the event of a conflict, the version most favorable to the defendant must be accepted."

We find that the court did give appellant's tendered instruction number 7, which adequately covered the subject of reasonable doubt.

The next specification is that the court erred in refusing to discharge the jury and to permit the defendant to interrogate the jurors as to whether or not they had been prejudiced by a newspaper article. The motion set out that a newspaper story had been published by an Evansville newspaper in the

adjoining county regarding the trial of the appellant. This publication occurred on Sunday after the jury had been impaneled on the Friday before and the members of the jury were permitted to return home over the weekend.

It is contended this paper was circulated in the county of the trial and that it may be assumed the jurors read the article. The article stated that the defendant had been convicted previously and served time in the Kentucky State Prison, and made the comment that he had been beaten, stabbed, gassed and finally shot Henshaw, the decedent, and that he had attempted to escape from the jail. It is contended the newspaper comments were highly prejudicial, and were not relevant matters for the jurors to consider; that if the defendant did not take the stand, the facts regarding his previous conviction or attempted escape could not be brought out at the trial. With this latter contention we cannot agree, since in this case the plea of insanity had been made by the defendant himself, and without question this opened the door to all the defendant's previous experiences, including prison terms and other crimes that he might have committed.

It is further pointed out by the State that the jury was admonished by the court not to read the newspapers or listen to comments with reference to the trial or the crime with which the appellant was charged, and that there was no evidence presented that the jurors had violated the court's instructions. There was only one news article of which complaint was made. There was no direct evidence that any of the jurors had read the newspaper article, and if they had, there was no evidence that they were thereby prejudiced. There is no presumption that the jury violated the court's admonition not to read the newspaper articles concerning the trial. *Weer* v. *State* (1941), 219 Ind. 217, 36 N. E. 2d 787; 37 N. E. 2d 537. See also: *People* v. *Herbert* (1930), 340 Ill. 320, 172 N. E. 740.

The issue here is one of discretion of the trial court. *Marshall* v. *United States* (1959), 360 U. S. 310, 79 S. Ct. 1171, 3 L. Ed. 2d 1250; *Thistle* v. *People* (1948), 119 Colo. 1, 199

P. 2d 642; Annot., 31 A. L. R. 2d 417 (1953) ; 50 C. J. S., Juries, § 238, p. 990.

There must be a balancing of the factors of the public's right to a free press under the Constitution and the invasion of the right of the accused to have an impartial jury, uninfluenced by newspaper comments. The right to a fair trial becomes a mockery if, during the trial, outside sources are permitted to influence jurors. Undoubtedly the trial court has the authority to prevent such prejudicial action. Jurors who violate the court's instructions, of course, are subject to punishment by the court. At the same time, a defendant who might anticipate an unusual amount of publicity in serious crimes such as that charged in this case, is entitled to have the jury kept separated and free from any interference or influence by news media. No doubt this is a hardship upon jurors, and such procedure should be sparingly invoked. There are remedies and there are means of protecting jurors from undue influence.

The trial court must have some discretion in this matter. We cannot say under the record here that the trial court abused its discretion.

Judgment is affirmed.

Rakestraw, C. J., concurs. Myers, J., concurs with opinion. Jackson, J., concurs in result. Achor, J., not participating.

## CONCURRING OPINION

MYERS, J.—I concur in the opinion as written by Judge Arterburn, but have this to add in regard to the error charged by appellant in overruling the motion to suppress the evidence because of illegal search and seizure.

In my opinion, the police officer was properly on the premises without a search warrant when he saw the murdered man. He was the first witness to testify for the State. He said that on the morning of January 23, 1962, at approximately 9:00 a.m., he was on duty and had a call that an accident had taken place; that he went to 1311 Mary Street,

in Evansville, but did not find any accident; that he was told to go upstairs; that he went upstairs and smelled smoke and saw a man lying in bed who was apparently dead; that there were two firemen there; that the dead man had been beaten and shot and blood covered him; that the smoke in the place was from a smoldering divan.

From what we can gather from the officer's testimony, it is not certain that he approached the premises with the idea that a homicide had been committed. He was only informed that an "accident" had taken place. Upon arrival, he said he found no "accident," but when "told to go upstairs," there was smoke and firemen present. This is when he saw the decedent on the bed. Under these circumstances, did the police officer have a right to be on the premises and thereafter make a search of the room where the deceased was lying? In my opinion, the smoke coming from the building was an emergency and could have been a major crisis which confronted the officer. Indications that there was a fire did not give him opportunity to first apply to a magistrate for authorization to enter the building. In the line of duty, he was obliged to take immediate action which brought him inside the premises without violating constitutional guaranties. Unavoidable crisis is an established exception to invading a home without a warrant. *District of Columbia* v. *Little* (1949), App. D. C., 178 F. 2d 13, 13 A. L. R. 2d 954, 962. Thereafter when he discovered the murdered body, his search of the room was lawful.

NOTE.—Reported in 217 N. E. 2d 147.