**Bill J. BENEFIEL, Appellant,**

v.

**STATE of Indiana, Appellee.**

No. 84S00–8906–CR–483.

Supreme Court of Indiana.

Sept. 18, 1991.

Christopher B. Gambill, Daniel L. Weber, Vigo County Public Defenders, Terre Haute, for appellant.

Linley E. Pearson, Atty. Gen., Arthur Thaddeus Perry, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Justice.

A jury trial resulted in the conviction of appellant of Count I, Criminal Confinement, a Class B felony; Count II, Rape, a Class B felony; Count III, Criminal Deviate Conduct, a Class B felony; and Count IV, Murder, a felony. Following a guilty verdict on all counts, the jury recommended the death penalty, and appellant was so sentenced.

The State's case was established largely on the testimony of Alicia Elmore, a surviving victim. On October 10, 1986 at approximately 7:30 p.m., seventeen-year-old Alicia Elmore walked to a gas station two blocks from her home in Terre Haute, Indiana to purchase soft drinks for her mother and brother who were ill. As she returned home, a man wearing a mask and carrying a gun accosted her and asked her for money. When she said she had no money, he grabbed her and forced her to walk down an alley. The assailant then pushed her into a garage where he instructed her not to make any noise or he would shoot her.

The assailant pushed her to the floor and started taking off her clothes. Upon removing her clothing, he tied her up with some of her clothes and wire from a lamp.

He stuffed some clothing in her mouth and put her jeans over her head so she could not see. In order to prevent her from moving, he placed two heavy bags on her back. He then left and returned a few moments later, placed her in his van and drove around for a few minutes. He carried her into a house and laid her on a mattress on the floor. Throughout this period, the assailant warned her not to scream and told her that if she did, he would kill her.

Once inside the house, he asked her what her name was and where she lived. He untied her and took photographs of her. During this period, he kept her head covered. He then raped her. During intercourse, he kept a gun against her head and warned her not to scream. He placed a chain around her neck and fastened it to the bed. He also handcuffed her to the side railing of the bed and tied her feet together with a rope. He left for approximately fifteen minutes and upon his return, he informed her that he had gone back to the garage to pick up her clothing and the soft drinks she had dropped. He again forced her to have intercourse in the same manner as he had before. When he tied her up, he put duct tape over her eyes and placed a large wad of toilet paper in her mouth and taped her mouth shut.

The next day he forced her to perform oral sex. Following this, he handcuffed her arms to the railing and handcuffed her ankles together. Later, she determined that it was daylight and attempted to escape by scooting the bed frame toward the doorway. She chewed the tape off of her mouth and began screaming. When she began screaming, the assailant came into the room and threw a blanket over her head. After telling her that she was not supposed to scream, he slapped her, took out a knife and cut her on her back, cut off one of her fingernails, and cut off a portion of her hair. He then warned her not to try to escape again or he would kill her. In addition, he placed the gun to the side of her head and "clicked" it. When he was cutting off her hair, he informed her that he was placing it in a scrapbook with samples of hair from other women he had

raped. He then put glue in her eyes so they would be stuck shut. He also placed more tape over her eyes and more toilet paper in her mouth. Later that day, he again forced her to have sexual intercourse.

On October 12, he had intercourse with her twice in the same manner as he had before. He fed her a sandwich which was the first time she had eaten since she had been abducted. During her captivity, Alicia was able to tell the changing of the days by listening to the radio, and up to October 13, she had not slept. Sexual intercourse occurred daily during her captivity with her life always being threatened.

During four months of captivity, Alicia counted being raped a minimum of 64 times. She stopped counting because she was getting confused in trying to keep count of how many days she had been held and the number of times she had been raped. On October 30, the assailant informed her that they were going to have a Halloween party. That night he took a knife and cut the side of her neck and a place on her chest. In addition, he stuck the gun in her vagina and forced her to have anal intercourse.

During the first two months of captivity, Alicia's eyes were glued together and taped. A few times during her early captivity, the assailant would want to see her eyes so he would put his mask on and "pry" open her eyes for only a few moments. She was not allowed to go to the bathroom when she needed to during the first few months and was fed only a baked potato and a glass of water during this time. One time during this period, the assailant made her hold the bullets to the gun and told her that one of the bullets had her name on it. Alicia thought that an escape would be impossible because the assailant told her about his dogs, which she could hear from inside the house. She was not allowed to bathe on her own. A few times throughout this period the assailant gave her a bath. Most of the time she was chained to the bed and was naked. During her captivity, appellant would ask her whether she wanted to die slowly or quick-

ly. Upon responding that she would want to die quickly, he would respond by telling her that her death would be long and painful.

On December 9, 1986, there was a need for Alicia to go to the hospital in Vincennes, Indiana because she was bleeding vaginally. On this occasion, she was able to see her assailant for the first time. He not only took off his mask but also untaped her eyes and unchained her. In order to prevent her from screaming on the way out to the van, he showed her the gun. She noticed the color of the van and the various items in the van including police scanners. On the way to the hospital, he made her drive despite the fact that she barely could see. Upon arriving at the hospital, he again warned her not to say anything or else he would kill everyone. He also informed her that she was to tell hospital personnel that her name was Mary Benefiel and that she was eighteen years old.

Alicia was examined by a doctor and a nurse. Throughout the examination, the assailant was only a few feet away. At one point, the doctor asked her what was wrong with her eyes, but before she could respond, the assailant stated it was because she had been crying so much. At no time did she inform anyone at the hospital because she was afraid he would kill them. Following the examination, the doctor informed Alicia that she was pregnant and not to have sexual intercourse for three weeks. Thereafter, they left the hospital and drove back to the house in Terre Haute. On this occasion, she recognized for the first time that the color of the house was yellow. The address turned out to be 323 South 13½ Street. Upon arriving, he did not retape her eyes and did not wear his mask.

On December 10, appellant had sexual intercourse with Alicia despite the doctor's recommendation. A few weeks later, she was moved to another house. To accomplish this, appellant tied her up and carried her out to the van, drove around for a few minutes and then carried her into the other house. This address turned out to be 322 South 13½ Street, across the street from

the first address. The color of the house at 322 was brown. As soon as they entered the house, he chained her to the bed.

Soon after they were in the house at 322, he again forced her to have sexual intercourse as well as oral intercourse. While Alicia was in the house at 322, she heard police scanners which were used by appellant. With these scanners, he was able to find out which houses he could burglarize following some event at those houses. That is, appellant knew the codes used by the police.

On January 26, 1987, Alicia thought that someone else was in the house because she heard noises in the basement. Later, appellant informed Alicia that he in fact did have someone else in the house. On the evening of January 27, 1987, Alicia saw the other individual, Delores Wells, whom she knew. Appellant told Alicia how he captured Delores and what he did with her once he had her.

When Alicia first saw Delores, she was on a water bed in another bedroom. Delores was naked, had handcuffs on her hands, tape over her eyes, paper towels in her mouth, and tape over her mouth. During the time Delores was in the house at 322, Alicia never spoke with her because appellant warned her not to.

On February 4, 1987, appellant told Alicia to come into Delores' room. When she got to the room, she saw Delores laying on the mattress with her hands handcuffed behind her back and her ankles handcuffed together. At that point, he started beating her all over her body with his fists, then he took an electrical cord and started hitting her with it. Later, Alicia saw the injuries to Delores, which included welts on her arms and legs, and her face was black and blue as well as being swollen. On another occasion, appellant cut off all of her hair and cut her finger. Appellant also asked Delores if she wanted to die quickly or slowly to which she responded quickly. Appellant stated that she would die slowly.

On February 7, 1987, appellant left the house for approximately two hours, and when he returned, he had mud from his waist down and had blisters on his palms.

He told Alicia that he had been digging a grave which was big enough for two people. At that point, she thought he was going to kill Delores and her. Later, on February 7, he had Alicia go into Delores' room and made her watch as he put super glue in her nose and pinched it together. He then put toilet paper in her mouth and taped it shut. At this point, Delores started squirming around. Alicia then left the room.

A short time later appellant chained Alicia to the bed and left. At that point, she did not hear anything in the house. Approximately two hours later, appellant returned and stated that he had killed Delores. He told Alicia that he tied her arms and legs to two separate trees, then took duct tape and wrapped it completely around her head until she died. To make sure she was dead, he took her neck and "popped" it. He then stated that he buried her. He explained to Alicia that he had to kill her because she knew too much.

On the morning of February 11, 1987, appellant stated to Alicia that the police were coming. At that point, he started drilling holes in the floor and instructed her to gather everything with her name on it. When he was unable to put her under the floor, he pushed her into a crawl space of the suspended ceiling and warned her not to make a sound. The police knocked on the door and informed appellant that they had a search warrant. Appellant told the police that he did not know who they were looking for, and a few moments later, he informed them that Alicia was up in the ceiling. The police then removed her from the ceiling, and because appellant was there, she informed the police that she was there on her own. However, when she went to the hospital, she informed the police as to what had happened. On the same day that Alicia was discovered, a search of appellant's van revealed various items including a mask, a post-hole digger, a rake, a shovel, a pocket knife, .22 caliber rifle shells, and rope.

On February 22, 1987, a group of volunteers searched for Delores in various areas in Terre Haute. One volunteer, Tom Farris, discovered a freshly disturbed area where Delores Wells' body was found.

An autopsy on Delores Wells revealed internal and external injuries to the anus and injuries to the vagina indicating a violent rape. The pathologist stated that Delores Wells was raped before her death, that the injuries to the anus and vagina were fresh, and that she died as the result of asphyxia.

Evidence found in the trash at one of appellant's homes included a piece of duct tape which had hairs on it similar to the head, eyebrow, and eyelash hairs of Delores Wells. In addition, other hair particles found in the trash were similar to head hairs from Delores Wells and hairs sufficiently similar to the head, facial, and pubic hairs of appellant.

Appellant contends the trial court erred in refusing to quash search warrants. He claims the warrants were issued as a result of intentional or reckless misstatements of facts made by the affiant. As a result, certain evidence that was obtained was inadmissible as "fruits" of the illegal searches.

Sergeant Joe Newport presented Judge Michael Eldred four affidavits of probable cause on February 10, 1987, to search four buildings located on South 13½ Street in the city of Terre Haute, Indiana. The affidavits were identical and stated in substance that the affiants had learned through reports from the Terre Haute Police Department that a person identified as Alicia Elmore was reported missing on October 11, 1986, that on January 16, 1987, the affiant was informed by a confidential informant, who was known to be reliable and credible in the past, that the Elmore girl was in the company of Bill Benefiel, that Benefiel had access to four different houses in the 300 block of South 13½ Street in Terre Haute, and that he had been seen driving a blue van to the rear of the homes to pick up or drop off Elmore. Additional information was received that Benefiel had two girls who the informant believed were being held against their will. The search warrant, among other things,

authorized the police to search for and seize the person of Alicia Elmore.

It is appellant's contention that the affidavits contained false information in that he did not believe the informant spoke from personal knowledge or that Alicia Elmore was being held against her will. Upon cross-examination at the hearing on the motion to quash, Sergeant Newport conceded that much of the information had come to his informant through Benefiel's wife and that the informant did not have personal knowledge as to much of the information furnished.

In support of his position, appellant cites *Wong Sun v. United States* (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 for the proposition that all evidence which is "fruit of the poisonous tree" resulting from an illegal search should be excluded at trial.

■ In the case at bar, counsel for appellant objected to all evidence seized pursuant to the warrants, including testimony by Alicia Elmore, the victim, and contends all this evidence must be suppressed since the evidence is "fruit of the poisonous tree."

■ We agree with appellant that the affidavits presented to the trial judge contained secondhand hearsay information; therefore, they were insufficient as far as a search for property was concerned. However, an analysis of the problem does not stop here. Instead, we must review the policy reasons behind the exclusionary rule and determine whether the reasons for invoking such a rule should apply under the facts of the instant case to exclude any of the evidence, including Alicia's testimony. Three early cases credited with developing the rule include *Weeks v. United States* (1914), 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652; *Adams v. New York* (1904), 192 U.S. 585, 24 S.Ct. 372, 48 L.Ed. 575; and *Boyd v. United States*, (1886), 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746.

The *Weeks* decision established for the first time that in a federal prosecution the Fourth Amendment would bar any evidence obtained through an illegal search and seizure.

Approximately 50 years later, the United States Supreme Court decided *Mapp v. Ohio* (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, which extended the exclusionary rule to the states.

In 1922, our Supreme Court in *Callender v. State* (1922), 193 Ind. 91, 138 N.E. 817 adopted the exclusionary rule in an opinion written by Justice Willoughby. Writing for a unanimous court, Justice Willoughby relying on the Indiana Bill of Rights §§ 11 and 14 wrote:

> "If the property was secured by search and seizure under the pretext of a search warrant, which was invalid for any reason, then the property so seized could not be used as evidence against the appellant and its admission over his objection was prejudicial error." *Id.* at 96, 138 N.E. at 818.

Under the facts as presented to this Court in the instant case, we find that the policy reasons established for the "exclusionary rule" do not apply.

■ One of the well-recognized exceptions to the warrant requirement is an entry under emergency circumstances involving injury or imminent danger to a person's life for the purpose of preventing further injury or aiding those injured. *Bruce v. State* (1978), 268 Ind. 180, 375 N.E.2d 1042, *cert denied*, 439 U.S. 988, 99 S.Ct. 586, 58 L.Ed.2d 662.

In *Wilson v. State* (1966), 247 Ind. 454, 217 N.E.2d 147, this Court was confronted with an instance involving an emergency situation. In *Wilson* we said:

> "In our opinion, it would be an absurd interpretation of the law to say that a police officer informed of a homicide, should first have to obtain a search warrant to visit the apartment or home where the victim of the killing lay dead. Certainly the law does not hamstring the normal and emergency activities of police officers in their attempt to apprehend criminals to that extent. Alertness and promptness are to be commended on the part of law enforcement officers.
>
> In this case a man lay dead as a result of violence inflicted upon him in his own apartment. Any police officer who sees

or is informed of such a condition has not only the right, but the duty, to make an instant and prompt investigation. To say that someone, a visitor, who was temporarily on the premises by invitation at the time of the death of the victim, thereby acquires a constitutional right to insist upon a search warrant being first procured—while he flees from the scene, as in this case—is stretching constitutional interpretation to an absurdity.

Too frequently we over-emphasize the technical interpretation of a constitutional provision and overlook the major objective of the instrument, namely the protection of the public against internal and external enemies. The preamble to the Indiana Constitution states it was ordained ' * * * that justice be established, [and] public order maintained, * * * '; the United States Constitution to ' * * * establish justice, insure domestic tranquility, * * * ' Law-abiding citizens are entitled to the protection of the Constitution against criminal elements in society to as great, if not greater extent than the criminal. Too frequently we forget constitutional rights of citizens and victims of crime who constitute the public, thinking only of the criminal's rights, to the injury and breakdown of the effective enforcement of the law and to the detriment of 'domestic tranquility' and 'public order' as ordered by the Constitutions. Courts have had their difficulties in this field in defining the laws of search and seizure and balancing the public's right to protection against crime as against the rights of privacy of the individual." *Id.* at 458–59, 217 N.E.2d at 149–50.

The instant case presents facts on point with Justice Arterburn's remarks in *Wilson.* The case at bar fits squarely within the rule laid down in *Wilson.* The facts here are not merely the destruction of physical evidence, but involve a human life. The danger to the victim, Alicia, certainly outweighed appellant's reasonable expectations to privacy.

Alicia Elmore had been missing for several months, and in early January, the police received a call that Alicia Elmore was within five blocks of 13th and Ohio. The information received by Sergeant Newport, although in some instances secondhand hearsay, was nevertheless sufficient to authorize the police to enter the indicated dwellings without a warrant to secure the safety of Alicia Elmore. The secondhand hearsay which was furnished by the confidential informant was bolstered further by an anonymous telephone call that two girls were being held at the indicated location against their will.

■ The policy reasons behind the exclusionary rule fall short of its intended purpose where a person's life is in danger and the police have received information on the matter. Therefore, all the evidence including the testimony of the victim, Alicia, was properly admitted.

Appellant contends the trial court erred in admitting the testimony of Alicia Elmore as well as exhibits as to her abduction and mistreatment, contending that the evidence was irrelevant and immaterial. He contends this evidence involved testimony as to criminal acts which pertained to crimes committed in a different cause of action.

Appellant objected not only to Alicia Elmore testifying but to numerous exhibits including a photograph of a cabinet, a newspaper article about Alicia being missing, a gun, a comforter, and hair samples.

■ With regard to Alicia's testimony, the State properly points out that her testimony was not objected to on the grounds now advanced by appellant. Instead, the objection was related only to the grounds advanced on the motion to quash; that is, the testimony was the product of an illegal search. As discussed above, we decided this issue adversely to appellant's position. In addition, a defendant waives an issue on appeal where he states one ground for his position at trial and states another on appeal. *Jester v. State* (1990), Ind., 551 N.E.2d 840. Thus, this issue is waived. However, notwithstanding the waiver, appellant's contentions are without merit. This evidence was relevant and material. Appellant's insanity plea opened the door to all evidence relating to appellant and his

environment. *See Wilson v. State* (1966), 247 Ind. 454, 217 N.E.2d 147. Alicia's testimony was relevant to his mental state because she had the opportunity to observe his demeanor and conduct over a four-month period.

■ In addition, Alicia's testimony and the exhibits admitted during her testimony were admissible under the *res gestae* doctrine. She witnessed the events with regard to Delores Wells as well as being a victim herself. We find her testimony on such evidence was relevant and material. Likewise, her testimony about her own capture and treatment can be linked to Delores' capture and treatment. As we stated in *Tacy v. State* (1983), Ind., 452 N.E.2d 977, 981:

> "Evidence of happenings near in time and place to the charged crime is admissible to complete the telling of the story of the commission of the charged offenses, notwithstanding the fact this evidence includes testimony about uncharged offenses."

We find no error in the admission of the testimony of Alicia Elmore and the exhibits admitted in the instant case.

■ Appellant contends the trial court erred in allowing testimony of two previous victims which showed evidence of prior criminal acts by him arguing they were not related to the charges in the instant case.

During the trial, a witness identified only as "Diana" testified that at approximately 4:00 a.m., on November 23, 1978, she was asleep in her home when she was awakened by a noise. When she went to turn on her light, a man wearing a black ski mask was standing in her bedroom holding a gun. The assailant asked her for money and told her not to scream or else he would kill her. Following this, they went into another bedroom where he tied her to the bed with an electric cord. He then raped her and forced her to perform oral sex on him. However, prior to these acts the assailant took off his mask and she saw him. Afterward he forced her downstairs where he placed a sweater over her head, tied it to her head with a belt and took her out the back door of her house.

At this point, she started to scream, and the assailant ran away. Following this incident, she called the police but no one was ever charged with these crimes. During the trial in the case at bar, Diana identified appellant as the perpetrator of the crime against her.

Another witness identified only as "Mary" testified that on August 16, 1980, she was walking across a parking lot when a man wearing a nylon mask and carrying a gun ran from behind a building and grabbed her. At that point, he started ripping off her clothing. He performed oral sex on her and then raped her. Thereafter he tied her up with her clothing and put her in a shed. The assailant then placed her in the trunk of his car. Later, the assailant took her out of the trunk and raped her again. He then put putty in her eyes with tape over the putty. He told her to perform oral sex on him, then he began to perform anal sex on her. Thereafter he raped her again. At one point, the putty slid off her eyes and she saw the assailant who had removed his mask. During some of these sexual attacks, the assailant held a gun against her head. In addition, her head was shaved. The assailant eventually left her in a field and shortly thereafter she was able to free herself and to run for help. During the trial, she positively identified appellant as the perpetrator of the crimes against her.

Appellant concedes that under Indiana law an exception exists with regard to the general rule that evidence of prior crimes is inadmissible to prove the commission of the charged crime. This exception is known as a "common scheme or plan." *See Clark v. State* (1989), Ind., 536 N.E.2d 493. Another exception to this general rule is the depraved sexual instinct. *See Kuchel v. State* (1986), Ind., 501 N.E.2d 1032. Under the facts in this case, this evidence was admissible. *Id.*

■ However, appellant contends that the attacks on these two women are too remote since they occurred many years earlier, citing *Clark, supra,* where this Court held that a thirteen-year-old and a seven-

year-old drug conviction were too remote and dissimilar to be relevant as part of a common scheme or plan. In the instant case, the prior acts occurred six and eight years prior to the instant crimes. We find the facts in the instant case not to be too remote and dissimilar to be relevant because the attacks on these two women were similar to those described by Alicia. In addition, appellant's insanity plea opened the door to these matters. *Wilson, supra.* We find no error.

■ Appellant contends the trial court erred in failing to find him mentally ill. His argument is based on the theory that the court should have entered an order removing from the jury's consideration any finding of guilty and thus restricting the jury's verdict choices to guilty but mentally ill, not guilty by reason of insanity, or not guilty. He argues that following the verdict, the court should have entered judgment notwithstanding the verdict and found him mentally ill.

Indiana Code § 35–36–1–1 defines "mentally ill" as:

"[H]aving a psychiatric disorder which substantially disturbs a person's thinking, feeling, or behavior and impairs the person's ability to function; 'mentally ill' also includes having any mental retardation."

We find appellant does not meet this test because evidence was presented which showed his ability to monitor police, commit numerous burglaries, conceal and destroy possible evidence, and his manner of carrying out the various criminal acts.

■ Appellant's contention fails because a directed verdict is proper only where there is a total lack of evidence on some essential issue or where there is no conflict in the evidence and it is susceptible only to an inference in favor of the accused. *See Deneal v. State* (1984), Ind., 468 N.E.2d 1029. We find no error.

■ Appellant contends the trial court erred in failing to find him incompetent before or during trial.

■ We will not reweigh the evidence and will not overturn a factual deter-mination made by the trial court unless it is not supported by the facts and their inferences. *See Wallace v. State* (1985), Ind., 486 N.E.2d 445, *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 723. It is the province of the trial court to determine if the person to stand trial is competent to stand trial. *Id.*

Appellant contends there is nothing to suggest that he was competent to assist counsel. However, the record shows this not to be the case. At a hearing conducted on his competency on May 23, 1988, Dr. Crane and Dr. Murphy found appellant to be competent to stand trial. In fact, one of the doctors stated that appellant had the ability to cooperate with his attorneys but chose not to do so. The trial court based its decision on its observation of appellant's demeanor during trial in which it noted no change in his behavior.

Testimony presented at the hearing showed that Dr. Stewart, appellant's expert, one of his attorneys, and appellant himself all testified. However, the trial court was not bound by the testimony of the expert nor the others. *Id.* During the trial, appellant took the stand but following a recess he refused to continue to testify. This denied the State any chance to cross-examine him. The court noted not only this but also that appellant had noted a conversation between the court and the prosecutor which he brought to his counsel's attention. Based on this and other observations of appellant, the trial court determined that he was competent to stand trial. The trial court's determination is supported by the record.

Appellant contends the trial court erred in failing to declare the death penalty unconstitutional as applied to the instant case. He claims he was incapable of giving assistance to his counsel with regard to the death penalty issue. He also contends the prosecutor's discretion to seek the death penalty renders the statute unconstitutional.

With regard to the second part of appellant's claim, this Court in *Bieghler v. State* (1985), Ind., 481 N.E.2d 78, *cert. denied*

(1986), 475 U.S. 1031, 106 S.Ct. 1241, 89 L.Ed.2d 349, rejected attacks on the prosecutor's discretion to seek the death penalty.

With regard to the claim involving appellant's competence, as stated above, there was no abuse of discretion. We find no error.

■ Appellant argues that the trial court should have directed a verdict of not guilty by reason of insanity.

This Court in *Nagy v. State* (1979), 270 Ind. 384, 389, 386 N.E.2d 654, 657 stated:

"When reviewing the sufficiency of the evidence on the issue of sanity, we treat the issue like other questions of fact. This Court does not judge the credibility of witnesses nor reweigh evidence, but rather looks to the evidence most favorable to the State along with any reasonable inferences therefrom. If there is substantial evidence of probative value to support the jury's conclusion that the defendant was sane at the time of the commission of the crime, that conclusion will not be overturned."

In the case at bar, both court-appointed doctors testified that appellant was not insane at the time of the acts. In addition, Alicia Elmore testified as to appellant's demeanor and conduct during her captivity from which the jury could have found him sane. We find the record adequately supports such a finding, and the trial court's denial of a directed verdict was proper.

Appellant contends the trial court erred in refusing his Tendered Final Instruction No. 1. This instruction reads as follows:

"If a verdict of not responsible by reason of insanity is returned, there are laws in Indiana which will apply. You are not to speculate on the consequences of those laws, but simply to return that verdict supported by the evidence."

Appellant argues that such an instruction is required because several jurors expressed confusion about the effect of the verdict. However, a review of the record fails to disclose appellant's contention.

The record reveals that the court did give State's Instruction No. 10, which adequately covered this subject. We find no error in refusing this instruction.

■ Appellant contends the trial court erred in refusing to give his Tendered Final Instruction No. 6 concerning the use of charts by his expert, Dr. Stewart. This instruction reads as follows:

"CHARTS

Dr. Stewart's charts were shown to help him articulate what they showed.

It is for you to decide how to use and assess those charts and the testimony upon which they were based, as you decide this case."

The prosecutor argued that more attention would be focused on the use of the charts which would tend to confuse the jury. The trial court agreed. Counsel for appellant argued, however, that these charts were demonstrative evidence as part of Dr. Stewart's testimony. However, the court's Instruction No. 14 adequately covers this part of Dr. Stewart's testimony. We cannot say the trial court erred when this instruction emphasizes particular evidence. *See Phillips v. State* (1986), Ind., 496 N.E.2d 87.

■ Appellant contends the trial court erred in refusing to give his Tendered Final Instruction No. 10 concerning the jury's right to decide the law as well as the facts.

The court's Instruction No. 3 instructed the jury that they were both the judge of the law and the facts. Where the substance of a tendered instruction is covered by another instruction, it is proper to refuse the tendered instruction. *See Travis v. State* (1986), Ind., 488 N.E.2d 342. We find no error.

■ Appellant contends the trial court erred in giving State's Instruction No. 9, regarding appellant's decision to terminate his direct examination. This instruction was given as the court's Final Instruction No. 29 and reads as follows:

"Every defendant is privileged to testify in his own defense, or to refuse to do so. However, once a defendant decides to testify, he has no right to testify only to facts which tend in his favor without

subjecting himself to a cross-examination upon those facts.

The defendant in this case testified in his own defense, but he refused to submit himself to cross-examination by the State. The defendant's refusal to subject himself to cross-examination is a factor which you may consider in weighing his testimony."

This instruction was based on cases cited by the prosecution. *See Neely v. Israel* (7th Cir.1983), 715 F.2d 1261, *cert. denied* (1984), 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184; *Fitzpatrick v. United States* (1900), 178 U.S. 304, 20 S.Ct. 944, 44 L.Ed. 1078.

The testimony presented by appellant was exculpatory. In fact, he stated that he treated her well and did not hold her against her will. His refusal to retake the stand for cross-examination justified the giving of this instruction. We find no error.

■■■ Appellant contends the trial court erred in denying his motion in limine with regard to alleged criminal conduct at the penalty phase.

Indiana Code § 35–50–2–9 defines the evidence which is relevant for a jury's consideration at the penalty phase of a capital case. Appellant argues that *Gardner v. Florida* (1977), 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 precludes the State from introducing evidence of other criminal conduct which has not been reduced to conviction.

The State introduced no evidence at the penalty phase but merely incorporated the trial evidence. The State then requested the court to take judicial notice of the evidence. Appellant argues that had the motion been granted, counsel would have had more time to concentrate on other matters more helpful to appellant. Appellant's argument here fails because Ind.Code § 35–50–2–9 allows the jury to consider all the evidence which was introduced at the trial. We find no error.

■■■ Appellant contends the trial court erred in refusing to accept his tendered admission and stipulation of facts.

The court held a hearing on whether to accept the stipulation. Appellant argues that during the hearing he testified he knew what he signed and understood what it meant. However the record reveals the following:

"Judge Eldred: All right, did you read this document?

Defendant: Yeah, I tried to read it.

Judge Eldred: All right, do you understand in essence what this document says?

Defendant: Well, I didn't at first, but I think I do today, yeah.

Judge Eldred: All right, did you understand it when you signed it?

Defendant: Not really, huh uh.

Judge Eldred: Okay, but do you understand that pursuant to this document that you are for purposes of the upcoming trial admitting that you did certain facts?

Defendant: I guess that is what I signed."

The record goes on to show that appellant testified that he signed the document because his wife advised him to do so as well as his attorneys. At one point, when appellant was questioned regarding certain facts being admitted, he stated, "I can't take my signature back." When questioned by his own counsel if he wanted to enter the stipulation, he stated, "It's what you said to do, so, I guess that's the way—I guess it is best to sign it." In addition, he stated that he did not remember that one of the things he would be admitting was the rape of Delores Wells, and when questioned regarding admitting criminal deviate conduct, he stated, "I guess so."

During the findings, the court said that a plea agreement under similar circumstances would not be accepted. The court then went on to discuss the findings and concluded that it would not accept the stipulations due to appellant's answers.

The trial court did not err under the circumstances. *See Snyder v. State* (1986), Ind., 500 N.E.2d 154.

■■■ Appellant contends the trial court erred by improperly restricting the defini-

tion of insanity. He claims the trial court erred in rejecting his claim that irresistible impulse was available as part of the insanity defense.

Appellant concedes that Ind.Code § 35-41-3-6 was amended in 1984. Based on this, appellant argues that the State's position rested on the proposition that the only manner in which a defendant could be found not responsible by reason of insanity was if the jury found him unable to appreciate the wrongfulness of his conduct at the time of the offense. He argues, however, that despite this change case law recognizes the defense of irresistible impulse. Appellant cites *Nagy v. State* (1987), Ind., 505 N.E.2d 434 to support his contention. However, although the irresistible impulse theory was discussed in *Nagy,* there the defendant presented a theory that his impulse was so great as to demonstrate that he was insane. However, the case was decided on the proposition that there was abundant evidence to show his ability to function and plan, which defeated his claim of insanity.

It is true that cases in the past have discussed the irresistible impulse theory as being an integral part of the insanity plea. *See Whitaker v. State* (1960), 240 Ind. 676, 168 N.E.2d 212 and *Flowers v. State* (1956), 236 Ind. 151, 139 N.E.2d 185. However, the theory that an irresistible impulse would excuse the commission of a crime even though the defendant was otherwise sane caused a great deal of confusion and difficulty in that in the commission of almost any crime the defendant could claim that he had an irresistible impulse to commit the particular acts.

The legislature, being mindful of this difficulty, amended the statute in 1984 to confine the definition of insanity to the inability to differentiate right from wrong. This, of course, does not exclude the showing of irresistible impulse to show such inability, but it excludes irresistible impulse as a separate independent excuse for the commission of a criminal act.

The trial court did not err in refusing to give appellant's instructions regarding irresistible impulse.

Finally, the record reveals that Judge Eldred properly considered both aggravating and mitigating circumstances and properly imposed the death penalty in accordance with the Indiana Code.

The trial court is affirmed.

SHEPARD, C.J., and DICKSON and KRAHULIK, JJ., concur.

DeBRULER, J., concurs with separate opinion.

DeBRULER, Justice, concurring.

Appellant Benefiel's fourth amendment claim that the entry and search of one of his houses, wherein Alicia Elmore was discovered and rescued by Terre Haute Police, was improper due to a faulty search warrant and that the evidence obtained as a result thereof should have been suppressed, is properly rejected. As the police approached the house with their search warrant, they ran into Marilyn Dishon, sister of the confidential informant Jeanine Dishon. Jeanine had relayed information to the police supplied by Marilyn. They spoke to Marilyn. The officer recognized Marilyn's voice as that of an anonymous caller who had twice called and had reported the missing girl Alicia Elmore at that location and expressing fear for her family's safety. Marilyn affirmed that she had been the caller. The police then went into the home. When the officer learned Marilyn's identity as the anonymous caller and had personal confirmation of that fact from her at the very location described in the anonymous call, he was provided with an additional fact, which when put together with the other facts and circumstances known to him at the time, provided him with probable cause to believe that Alicia Elmore was then being held in the home against her will and was in danger and in need of immediate assistance. Irrespective of the legality of the warrants then in hand, the newly augmented factual basis supporting probable cause and exigent circumstances fully and independently justified the entry and search which resulted in the discovery and rescue of Alicia Elmore.

*Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970).

In this case the request for the death sentence alleges that appellant did intentionally kill Delores Wells while committing rape and criminal deviate conduct upon her. I.C. 35–50–2–9(b)(1). I find that this aggravator was proved beyond a reasonable doubt, and that the manner in which the aggravator was carried out places its weight in the high range. However, the impairment suffered by appellant as a result of mental disease is also entitled to substantial mitigating weight. I.C. 35–50–2–9(c)(6) and (8). That which tends to diminish this mitigator, however, is the evidence that shows that appellant's outbursts of violent conduct would be followed by longer periods during which he was not violent and was in control. This pattern existed over several years. Such periods of self control would have occurred during the several months during which he regularly assaulted and tortured his prisoner, Alicia Elmore. It is similarly significant that after having Elmore confined for a long time, he kidnapped Delores Wells and subjected her simultaneously to the same misconduct. He had both victims in the house, dealing with one and then the other. They could sometimes see one another. This shows a considerable capacity to appreciate the day to day events and the absence of persistent false perceptions. The remaining mitigators have a weight in the low range. I conclude that the aggravating circumstance here outweighs the mitigating ones and that the death penalty as envisioned in the statute is properly to be applied.