**Bill J. BENEFIEL, Appellant (Petitioner Below),**

v.

**STATE of Indiana, Appellee (Respondent Below).**

No. 84S00–9207–PD–590.

Supreme Court of Indiana.

Sept. 29, 1999.

Susan K. Carpenter, Public Defender of Indiana, Joanna Green, Deputy Public Defender, Marie F. Donnelly, Special Assistant to the State Public Defender, Indianapolis, Indiana, Attorneys for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

SHEPARD, Chief Justice.

A jury found Bill Benefiel guilty of criminal confinement, rape, criminal deviate conduct, and murder. The trial court sentenced Benefiel to death. We affirmed the convictions and sentence on direct appeal. *Benefiel v. State*, 578 N.E.2d 338 (Ind. 1991), *cert. denied*, 504 U.S. 987, 112 S.Ct. 2971, 119 L.Ed.2d 591 (1992). Benefiel filed a petition for post conviction relief, which was denied. He now appeals that denial.

### Facts

The facts of this case are available in our opinion on direct appeal. *Benefiel*, 578 N.E.2d at 339–43. We summarize the facts as follows:

On October 10, 1986, at about 7:30 p.m., seventeen year-old Alicia Elmore walked two blocks away from her home to run an errand for her mother and brother. As she returned, a man wearing a mask and carrying a gun grabbed her, pushed her into a garage, stripped her, covered her head, and bound her with her own clothes and electrical wire. He put her in his van, and took her to a house, where he took photographs of her and then raped her. He chained her neck and handcuffed her wrists to the bed; he tied her ankles together with rope. He gagged her and put glue in her eyes. He raped her multiple times. When she tried to escape, he cut her back and cut off a fingernail and part of her hair; he said they were for his scrapbook with samples from his other victims. Later, he cut her neck and chest, put his gun in her vagina, and forced her to have anal intercourse.

He held Alicia captive for four months, raping her daily at gunpoint. She lost count after sixty-four rapes. For the first few months, Benefiel kept her eyelids glued together and pried them open only when he wanted to see her eyes. At those times, he wore a mask so she could not see his face. Alicia could only go to the bathroom or bathe when Benefiel allowed her. He fed her a baked potato and a glass of water once a day.

Two months later, when Alicia was bleeding vaginally, Benefiel took off his mask and pried her eyes open. He took her to a distant hospital where they would not be recognized. He did not give her a chance to tell the doctors that she was a captive. When they returned, he moved her to another house, where he again chained her to the bed. Her eyes could now open, and she could see her attacker.

A month and a half later, Alicia heard someone else in the house. She then saw Delores Wells, naked, gagged, with her wrists and ankles handcuffed. Delores' eyes were taped shut. Benefiel beat Delores in front of Alicia with his fists and an electrical cord. Alicia saw the injuries to Delores: welts on her arms and legs and black bruises on her face. On another occasion, Benefiel cut off all of Delores' hair and cut into her finger.

A few days later, Benefiel left the house and returned dirty, with blisters on his

hands. He told Alicia that he had been digging a grave big enough for two people. He used it only for Delores, however. He forced Alicia to watch as he put super glue up Delores' nose and pinched it shut. He taped her mouth closed so she could not breathe. He took Delores from the house, and returned two hours later, informing Alicia that he had killed Delores. He said he tied Delores' arms and legs to separate trees, and wrapped duct tape around her head. When he thought she was dead, he "popped" her neck, just to be sure. Then he buried her.

After another few days had passed, the police came to Benefiel's house to search for Alicia. Benefiel hid her in a crawl space in the ceiling, where the police eventually found her. A search of the woods surrounding Terre Haute also revealed Delores' grave site and her body. The police found in Benefiel's houses and van: a mask, a post-hole digger, a rake, a shovel, a knife, .22 caliber rifle shells, rope, and Delores' eyelash, eyebrow, and head hairs stuck to some duct tape.

### Post–Conviction Proceedings

▇▇▇ Post-conviction proceedings do not afford a petitioner with a "super-appeal," *Coleman v. State*, 703 N.E.2d 1022, 1027 (Ind.1998), nor are they a substitute for direct appeal, Ind.Post–Conviction Rule 1(1)(b). Instead, our post-conviction rules create a narrow remedy for subsequent collateral challenges to convictions. *Coleman*, 703 N.E.2d at 1027. With the exception of ineffective assistance of counsel, which may be raised either on direct appeal or in post-conviction proceedings,. *Woods v. State*, 701 N.E.2d 1208, 1220

(Ind.1998), "[i]f an issue was known and available but not raised on appeal, it is waived." *Rouster v. State*, 705 N.E.2d 999, 1003 (Ind.1999).

Some of the claims Benefiel presents in this appeal are unavailable or *res judicata*. We address the merits of those that remain.

### I. Trial Court Instruction on Mitigating Evidence

▇▇▇ Benefiel challenges an instruction given during the penalty phase of his jury trial. The instruction at issue is Number Two, one of several by which the court informed the jury about various aspects of assessing aggravating and mitigating circumstances. Such a challenge is not available as a free-standing claim under P–C.R. 1, although it may reflect on the performance of counsel.

### II. The Trial Court's Sentencing Order

▇▇▇ Benefiel claims the sentencing court failed adequately to consider certain mitigating circumstances he contends are supported by evidence in the trial record. He also contends the court inappropriately considered non-statutory aggravators. The contentions were both available on direct appeal.[1] They may not be raised as free-standing matters on collateral review, though they might reflect on the performance of counsel.[2]

### III. Ineffective Assistance of Counsel

Benefiel contends he was deprived of his Sixth Amendment right to effective counsel. We address his multiple claims:

---

1. On direct appeal, Justice DeBruler provided us with his usual careful assessment of the aggravating and mitigating circumstances, covering much of the ground that Benefiel now seeks to re-open. *Benefiel*, 578 N.E.2d at 351 (DeBruler, J., concurring).

2. In accordance with the rules of appellate procedure, we will not address claims without argument. Ind.Appellate Rule 8.3(A)(7) ("Each error that appellant intends to raise ... shall be set forth specifically and followed by the argument applicable thereto."). On

this issue, as on the last, Benefiel has added a single sentence declaring that his previous counsel's failure to raise this issue on direct appeal amounts to ineffective assistance. (Petitioner–Appellant's Br. at 44, 50.) He "cannot evade [the post conviction rules] just by typing the words 'ineffective assistance of counsel'" next to claims of error. *Lane v. State*, 521 N.E.2d 947, 949 (Ind.1988). In order to avoid waiver, he must actually argue why his counsel were ineffective.

1. Whether counsel wrongly chose to focus on an insanity defense to the detriment of a better case on mental impairment and abuse as a mitigating circumstance;

2. Whether counsel were ineffective for not objecting to the trial court's definition of mitigating;

3. Whether counsel were ineffective for not objecting to the identification procedures of two prior uncharged rapes that were admitted into evidence at Benefiel's trial;

4. Whether counsel were ineffective for the cumulative effect of not objecting to:

 a. the trial court's definition of "mitigating" evidence,

 b. the State's comments about the defense's only expert,

 c. the admission of evidence of two prior uncharged rapes, and

 d. the comments of the prosecutor and the trial judge in combination with the final instructions that Benefiel alleges depreciated the jury's role in sentencing.

■ We analyze ineffective assistance of counsel claims under the two-part test announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Lowery v. State,* 640 N.E.2d 1031 (Ind.1994), *cert. denied,* 516 U.S. 992, 116 S.Ct. 525, 133 L.Ed.2d 432 (1995). To succeed, the petitioner must demonstrate both deficient performance and resulting prejudice. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *see also Douglas v. State,* 663 N.E.2d 1153 (Ind.1996). A deficient performance is that which falls below an objective standard of reasonableness. *Douglas,* 663 N.E.2d at 1154. Prejudice exists when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *see also Cook v. State,* 675 N.E.2d 687, 692 (Ind.1996). Of course, "a different outcome will not constitute prejudice if the ultimate result reached was fair and reliable." *Smith v. State,* 689 N.E.2d 1238, 1245 (Ind.1997).

■ Moreover, counsel's performance is presumed effective. *Douglas,* 663 N.E.2d at 1154. A petitioner "must offer strong and convincing evidence to overcome the presumption that counsel prepared and executed an effective defense." *Burris v. State,* 558 N.E.2d 1067, 1072 (Ind.1990), *cert. denied,* 516 U.S. 922, 116 S.Ct. 319, 133 L.Ed.2d 221 (1995).

■ A petitioner appealing the denial of post-conviction relief faces a rigorous standard of review. Here, the post-conviction court found that Benefiel's lawyers had "extensive backgrounds as criminal defense attorneys" and undertook "extensive efforts to prepare themselves for this case." (P–C.R. at 369.) Judge Nardi said they presented an "aggressive and extensive defense of the petitioner in the face of overwhelming evidence." (*Id.*) The challenger of the denial must demonstrate that the evidence, taken as a whole, is without conflict and that it "leads unerringly and unmistakably to a conclusion opposite to that reached by the trial court." *Weatherford v. State,* 619 N.E.2d 915, 917 (Ind. 1993). In other words, Benefiel must prove that the evidence, viewed in its entirety, leads unerringly and unmistakably to the conclusion that his counsel were ineffective.

■ *A. Insanity and Mitigation.* Benefiel argues that his trial counsel were ineffective for their limited presentation of Benefiel's mental illness and background of abuse and neglect. (Petitioner–Appellant's Br. at 51–52.) Specifically, he argues that counsel improperly focused almost exclusively on a weak insanity defense during the guilt phase of the trial and failed to introduce enough evidence of mental illness and abuse to serve as mitigation at the penalty phase. This bears resemblance to a claim we rejected in *Matheney v. State,* 688 N.E.2d 883, 898

(Ind.1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 1046, 143 L.Ed.2d 53 (1999).

Matheney argued on post-conviction that his trial lawyers chose badly in arguing insanity as a defense. We concluded that this claim failed on the deficient performance prong of the *Strickland* test:

> While present counsel bemoan trial counsel['s] decision to pursue the insanity defense, they provide no evidence of what alternative strategy trial counsel should have employed in its stead. Indeed, there is much to indicate that employing this defense was the best alternative available. There was no available defense that would have cast doubt on the fact that he intentionally killed [Delores Wells], and by employing the insanity defense, [Benefiel's] attorneys were able to introduce evidence that they otherwise would not have been able to submit. We conclude counsel did not perform at a level below professional norms.

*Id.* (citation omitted).

The piece of this argument aimed at the lawyers' performance during the penalty phase fails on the prejudice prong. He claims that his trial counsel should have offered the testimony of court-appointed experts who could attest to Benefiel's "severe personality disorder" and his genetic predisposition to "schizotypal personality disorder," (Petitioner–Appellant's Br. at 59), the testimony of the mental health professionals who prepared records concerning Benefiel's mental state when he was a teenager, (*id.* at 63), and the records of his adoption by Helen Benefiel, (*id.*).

The court-appointed experts did testify during the guilt phase that Benefiel suffered from schizotypal personality disorder, (T.R. at 3006–07, 3014–16), and from a mental disease or defect, (T.R. at 3057, 3084–85, 3097–98). Because the guilt phase evidence was incorporated into the penalty phase, (T.R. at 3350–51; *see also* T.R. at 3424), this evidence was available for the jury to consider when it determined its recommended punishment. The

evidence that post-conviction counsel says could and should have been submitted during the penalty phase carried much the same thrust. While hearing the same testimony again at the penalty phase might have reinforced the idea that the mental disease discussed during the guilt phase could have mitigating weight, we cannot say that the failure to reintroduce the testimony created a reasonable probability that the jury would have recommended against death. *See Matheney,* 688 N.E.2d at 899.

The jury did hear evidence of the mental disease or defect mitigator. Benefiel's counsel argued the mitigator forcefully in his penalty phase closing. (*See, e.g.,* T.R. at 3409, 3411.) Furthermore, the evidence presented by the State was overwhelming; the aggravator weighed very heavily in favor of the death penalty. Benefiel suffered no prejudice.

As to the testimony of the mental health professionals, the records they prepared were introduced into evidence at the guilt phase, (T.R. at 2566–74), and thus the information contained therein was also available to the jury when it recommended death. Moreover, Benefiel's trial counsel asked one of the court-appointed experts to describe the contents of the reports. (T.R. at 3063–64.) While the live testimony of the health professionals may have interested the jurors more than the expert's description of the reports or the written reports themselves, again "we cannot say that the failure to elicit such testimony ... creates 'a reasonable probability that the result of the proceeding would have been different.'" *Matheney,* 688 N.E.2d at 899 (quoting *Cook,* 675 N.E.2d at 692).

 Finally, with respect to Benefiel's claim that counsel should have sought his adoption records, Benefiel's biological mother testified under subpoena at the penalty phase about the adoption. (T.R. at 3366–87.) Her testimony was exceptionally probative of Benefiel's abandonment

and abuse. Again, Benefiel's contention that counsel's failure to dig up adoption reports written in 1963 fails the *Strickland* prejudice prong, at least. (P–C.R. at 1096–97.)

*B. Mitigation Instruction.* Benefiel also claims that trial counsel were deficient for failing to ensure that the jury was properly instructed about the role of mitigating circumstances.[3] (Petitioner–Appellant's Br. at 64.) The main thrust of this point is that counsel should have objected to the portion of Death Penalty Instruction 2 that states, "Mitigating is defined as a fact or circumstance which makes an offense appear less severe." (T.R. at 385; Petitioner–Appellant's Br. at 35–36, 64–65.)[4] Benefiel claims that the instruction "impermissibly limited the jury's consideration of mitigating circumstances to [those] surrounding the 'offense,'" thereby precluding consideration of his "long-standing mental illness and bizarre childhood." (Petitioner–Appellant's Br. at 39.)

 Jury instruction lies largely within the discretion of the trial court. *Coleman,* 703 N.E.2d at 1032; *see also Edgecomb v. State,* 673 N.E.2d 1185, 1196 (Ind.1996). On appeal, such issues are reviewed for abuse of discretion. "To constitute an abuse of discretion, the instruction given must be erroneous, and the instructions taken as a whole must misstate the law or otherwise mislead the jury." *Coleman,* 703 N.E.2d at 1032 (citing *Reaves v. State,* 586 N.E.2d 847 (Ind. 1992)).

 We are satisfied that a lawyer performing reasonably well could decide the instructions as a whole gave the jury an adequate picture of its role and take a pass on objecting to this particular instruction. Death Penalty Instruction 8 explicitly informs the jury that it is to examine mitigating factors beyond those surrounding the offense. The instruction states in part, "In deciding upon your recommendation you must focus your attention and consideration upon *the defendant.* The crimes he committed and who he committed them against has been decided." (T.R. 391, 3428 (emphasis added).)

Instruction 1, moreover, informed the jury that it could consider extreme mental or emotional disturbance and mental disease or defect that substantially impairs the ability to understand culpability or conform conduct to law. (T.R. at 384,

---

3. When asserting a claim that trial counsel were ineffective, post-conviction counsel must use the well-established test discussed above, that counsel's performance was deficient, the deficience caused him prejudice, and his conviction was unreliable or fundamentally unfair. *Lockhart v. Fretwell,* 506 U.S. 364, 369–71, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

Benefiel's deficient performance argument consists solely of a reference to another section of his brief. (Petitioner–Appellant's Br. at 65 ("In Argument I, *infra,* which is incorporated herein, Benefiel has already addressed the inadequacies in the instructions on mitigation.").) As Professor Stroud has said: "It is not sufficient to merely refer to a prior argument in the brief." 4A Kenneth M. Stroud, *Indiana Practice* 96 (2d ed.1990), citing *Williams v. State,* 408 N.E.2d 123, 125 (Ind.Ct.App.1980); *see also* App.R. 8.3(A)(7). Benefiel does not claim that trial counsel's failure to object to the mitigation instruction caused him prejudice or rendered his conviction unfair or unreliable. (*See* Petitioner–Appellant's Br. at 64–69.)

While we discuss this issue on the merits, despite the woeful inadequacy of its argument, we will not discuss Benefiel's other related claim that "[d]uring closing argument, trial counsel's only argument concerning mitigation consisted of reiterating the trial court's charge," (Petitioner–Appellant's Br. at 65), because his post-conviction counsel failed to mention, let alone demonstrate, *any* of the parts of the ineffective assistance of counsel framework. We simply note that the claim is unsupported by the record. (*See* T.R. at 3409, 3411, where counsel did explain and argue mitigation to the jury at the penalty phase.)

4. The instruction in its entirety reads:

Mitigating is defined as a fact or circumstance which makes an offense appear less severe. So, even though a mitigating circumstance does not constitute a justification of or excuse for the offenses in question, it should, in the interests of fairness and mercy, be considered as reducing Bill J. Benefiel's moral culpability.
(T.R. at 385.)

3424.) The jury, therefore, was aware that it could consider Benefiel's mental condition, insofar as it was extreme or it substantially impaired his conduct or appreciation of culpability. Instruction 1 further instructs the jury to weigh any other circumstances appropriate for consideration. (*Id.*) Instruction 9 reiterates that the jury may contemplate other mitigators, "even ... if not specifically listed in the statute." (T.R. at 392, 3429.) Benefiel's background and his mental condition, even if they did not rise to the extreme or substantially impair his mind or action, are other factors appropriate for the jury's consideration. While the trial court did not explicitly enumerate these factors, we think that the instructions, when read together, led the jury to the conclusion that it must contemplate those very types of factors "in the interests of fairness and mercy...." (T.R. at 385, 3426.)

■ *C. Identification Procedures.* Benefiel argues that, had his trial counsel researched eyewitness identification or employed an expert, they would have learned eyewitness identification is often unreliable. (Petitioner–Appellant's Br. at 72.) He claims that counsel should have presented this unreliability to the trial court, who would have, in turn, excluded the testimony of two women who claimed that Benefiel had kidnaped and raped them six and eight years prior to the crime charged in this case. (*Id.* at 73.) Benefiel lists several factors indicating unreliability: that the women identified Benefiel from news footage and photographs rather than from a photo array or lineup, that a significant amount of time had passed between the crimes against these women and each's identification of Benefiel as the attacker, that the victims did not get a good look at their attackers, and that Benefiel did not and does not have a distinguishing feature that both women mentioned in their descriptions of their attackers. (*Id.* at 72.) His claim of error remains, however, that his trial counsel were ineffective for failing to research eyewitness identification or for failing to employ an eyewitness expert. (*Id.*)

We agree with Judge Nardi that "[t]he fact that some defendants now employ eyewitness identification experts to assist in their defense[s] does not mean that error was committed by defense counsel in this case...." (P–C.R. at 371.) Because "[w]e need not determine whether counsel's performance was deficient before examining the prejudice suffered as a result of the alleged deficiencies," *Coleman,* 703 N.E.2d at 1028 (citing *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052), we decide this issue on the prejudice prong of *Strickland.*

We decided a similar claim in *Coleman,* 703 N.E.2d at 1033 (counsel not ineffective for failing to challenge trial court's denial of funds for eyewitness identification expert). Benefiel "has not demonstrated a reasonable probability that had th[is] argument[ ] been raised, [it] likely would have succeeded on appeal. We conclude that ... counsel did not provide ineffective assistance by taking a pass on this claim." *Id.* Furthermore, given the amount of evidence presented by the State against Benefiel, we are not persuaded that defense counsel's failure to argue the unreliability of eyewitness testimony rendered his death sentence unreliable or fundamentally unfair. *See id.* To the extent that his counsel's performance was deficient, a better performance on this score would not have changed the outcome.

■ *D. Cumulative Effect.* Finally, Benefiel argues that his counsel were ineffective for the cumulative effect of failing to object to four alleged errors: the trial judge's definition of mitigating evidence, the State's comments about the defense's only expert, the admission of evidence of two prior uncharged rapes, and the voir dire comments and guilt phase instructions that allegedly depreciated the jury's role in sentencing. (Petitioner–Appellant's Br. at 73–74.) We have already addressed two of these four contentions. We turn to the two others.

Trial counsel did not object to the State's closing argument on the basis that the prosecutor improperly denigrated the defense expert, and the issue thus did not arise on appeal. On the other hand, there was no error upon which to base such an objection. While the original transcript of the argument indicates that the prosecutor called the expert's qualifications "stolen," (T.R. at 3288), the corrected record now makes it apparent that the prosecutor stated that his qualifications are "sterling," (Supp.P–C.R. at 3). Moreover, while the prosecutor called the expert a "hired gun," (T.R. at 3288), and implied that his job was to manufacture a defense for Benefiel, (*id.*), such statements simply do not amount to improper denigration.[5]

Finally, the jury was not misled to believe that it lacked any "real responsibility regarding Benefiel's sentencing." (Petitioner–Appellant's Br. at 74.) Benefiel claims error because during voir dire the judge told the jury that "it is solely the responsibility of the trial judge to make the final decision," and that he, the judge, was "ultimately responsible" for the sentence. (Petitioner–Appellant's Br. at 84.) "As we have held before, it is not error to accurately describe to the [members of the] jury that, under Indiana's death penalty statute, they give a sentencing recommendation to the judge, who then makes the final decision." *Hough v. State,* 690 N.E.2d 267, 270 (Ind.1997), *cert. denied,* — U.S. —, 119 S.Ct. 550, 142 L.Ed.2d 457 (1998). Benefiel also claims that his counsel should have objected to the guilt phase instruction stating that the jury should deliberate "without being influenced by the apparent severity or lenience of the sentence." (Petitioner–Appellant's Br. at 85; T.R. at 333.) "[W]e have held that informing the [members of the] jury of their function in the bifurcated proceeding is proper." *Harden v. State,* 576

N.E.2d 590, 596 (Ind.1991). The guilt phase instruction is an accurate statement of how juries should approach their role in a bifurcated trial; they should separately determine the defendant's guilt and then recommend the penalty.

Benefiel has not demonstrated a "cumulative ineffective assistance of counsel effect" arising from the combination of these four trial occurrences, none of which individually amounts to ineffectiveness. "With reference to cumulative attorney error, as with any ineffective assistance of counsel claim, defendant must *show* both poor performance and prejudice. If trial counsel committed any errors, they do not amount to prejudice because defendant has not shown a reasonable possibility that, but for the alleged errors, the result would have been different." *Hough,* 690 N.E.2d at 275 (emphasis added).

*E. Conclusion.* Benefiel has not succeeded in demonstrating on appeal that the evidence leads solely to a conclusion that Judge Nardi was wrong when he found that Benefiel's lawyers provided an aggressive and extensive defense consistent with the Sixth Amendment.

## IV. Benefiel's Departure from the Trial

Benefiel testified on his own behalf. After a recess during this testimony, he refused to return to the courtroom.

Benefiel argues that his right to be present at trial was violated because the procedures used to determine his competency to waive that right were inadequate, and because his waiver of that right was not knowing and voluntary. (Petitioner–Appellant's Br. at 74–75.) He terms these alleged errors "fundamental." (*Id.* at 83.)

"A court is required to hold a hearing to determine the defendant's

---

5. This Court has, itself, referred to experts testifying on behalf of one party or another as "hired guns." *See, e.g., Palmer v. State,* 486 N.E.2d 477, 481–82 (Ind.1985) (discussing Indiana's system of appointing disinterested experts to determine sanity as providing a "more reliable fact-finding basis than would a system in which both sides show up for trial with their own 'hired guns.' ")

competency to stand trial only when it is confronted with evidence creating a reasonable doubt about the defendant's competency. Whether reasonable grounds exist to order an evaluation of competency is a decision assigned to the sound discretion of the trial court, reviewable only for an abuse of discretion." *Haviland v. State*, 677 N.E.2d 509, 516 (Ind. 1997) (citations omitted). In *Haviland*, the trial court held prior competency hearings before it again heard a defense expert testify that the defendant was incompetent. We held that the court did not abuse its discretion when it found that the defendant *remained* competent and that another competency hearing was unnecessary. *Id.* In this case, in highly similar circumstances, Judge Eldred held a hearing in chambers and reached the same conclusion. (T.R. at 2551–52 ("Really, based on what I have seen of [Benefiel] today and throughout this trial, I see no real difference in his behavior.")).

Benefiel obviously knew of his right to be present inasmuch as he had spent the trial in the courtroom. Judge Eldred reminded him of this fact, saying, "you know that you have a right to be in the courtroom during this trial, if you want to be." (T.R. at 2550.) Benefiel's response, "I can't," (*id.*), does little to indicate that he did not know of and voluntarily waive his right to be at the trial.

■ Although Benefiel summarily terms the alleged error in these claims "fundamental," (Petitioner–Appellant's Br. at 83), he "makes no effort to demonstrate fundamental error. We find such claims, even if available under the fundamental error doctrine, waived for failure to comply with Ind.Appellate Rule 8.3(A)(7)." *Brown v. State*, 698 N.E.2d 1132, 1145 n. 16 (Ind.1998), *cert. denied,* — U.S. —, 119 S.Ct. 1367, 143 L.Ed.2d 527 (1999).

**6.** *See, e.g., Benefiel*, 578 N.E.2d at 350 (De-Bruler, J., concurring) (as police approached Benefiel's house, previously unidentified in-

## V. Depreciating the Jury's Role

■ Benefiel contends that the court erred by instructing the jury, "The Judge is solely responsible for assessing the penalty." (T.R. at 333.) Indiana is a jury recommendation state, of course, in which the decision to impose death or a term of years is made by the trial judge. Ind. Code Ann. § 35–50–2–9 (West Supp.1998). Benefiel contends that this instruction and similar statements by the court during voir dire "obviated the jury's responsibility in returning its recommendation elsewhere." (Petitioner–Appellant's Br. at 88.) This claim was available on direct appeal and is barred here.

## VI. Prosecutorial Misconduct

■ Several days after his arrest, Benefiel contacted a local police detective and offered to help him find Delores Wells. In testifying about the conversation he had with Benefiel, the detective was asked if Benefiel had said anything incriminating about Wells' disappearance. "No, sir," he replied. (T.R. at 2424–25.) Benefiel claims this constituted a violation of his Fifth Amendment right not to be a witness against himself.

This claim was not raised on direct appeal, when it was plainly available. It is waived.

## VII. Search of Benefiel's House

■ Benefiel seeks to challenge the trial court's denial of his motion to exclude the products of the search of his home. This matter was raised on direct appeal and resolved against him. *Benefiel*, 578 N.E.2d at 346. The Court was unanimous on this point, although there were differing views on why the trial court had properly denied the motion to exclude.[6] The ruling on direct appeal is *res judicata*.

formant appeared and confirmed her information, thus providing probable cause).

## VIII. Death Penalty Protocol

Benefiel argues that the Department of Correction violated due process by failing to provide a sufficiently detailed written description of how Benefiel will be put to death. (Petitioner–Appellant's Br. at 101.) This claim was not raised until after the post-conviction proceedings, by a motion to correct error.[7]

A motion to correct error is designed to provide post-judgment relief in a few very limited situations. *See* Ind.Trial Rule 59(A). Here, Benefiel must prove that he has "[n]ewly discovered material evidence ... which, with reasonable diligence, could not have been discovered and produced at trial." *Id.* We agree with Judge Nardi, the post-conviction judge, that the evidence underlying this claim was available at the time of Benefiel's post-conviction hearing. (P–C.R. at 726.) While it is true that, prior to the motion to correct error, there had not been an execution by lethal injection in Indiana, (*id.*), Benefiel did not and does not challenge the methods employed in the first (and subsequent) lethal injection proceedings, (*see* P–C.R. at 702, 1859). Rather, he challenges the adequacy of the Department's existing ten-page operational directive on the execution of death sentences. There is no apparent reason for tardy presentation of this claim, such as it is.[8] "All grounds for relief available to a petitioner under [Post–Conviction Rule 1] must be raised in his original petition." P–C.R. 1(8). Because Benefiel did not exercise reasonable diligence to discover and present this issue in his post-conviction petition, it is now waived.

## IX. Constitutional Claims

Benefiel argues that the death penalty statute is unconstitutional, both on its face and as applied to him. (Petitioner–Appellant's Br. at 107.) The "as applied" claim was already decided on direct appeal, and as such is *res judicata*. *Benefiel*, 578 N.E.2d at 347–48. In his post-conviction brief, Benefiel asserts eight claims regarding the constitutionality of the death penalty statute on its face, without supporting any of the claims with argument. (Petitioner–Appellant's Br. at 107–09.)

We have already explicitly decided each of the sub-claims, adversely to Benefiel. We reiterate: (1) The felony murder aggravator is not overbroad. *Matheney*, 688 N.E.2d at 905. (2) When a petitioner has been convicted of intentional murder, use of the felony murder aggravator at the penalty phase does not amount to double jeopardy. *Cf. Wisehart v. State*, 693 N.E.2d 23 (Ind.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1338, 143 L.Ed.2d 502 (1999); *see also Matheney*, 688 N.E.2d at 904. (3) The word "may" in Ind.Code § 35–50–2–9(c) does not violate the mandate that the sentencer must consider mitigating evidence. *Matheney*, 688 N.E.2d at 906–07. (4) Indiana Code § 35–50–2–9(c) does not preclude consideration of non-extreme emotional disturbances or non-substantial impairment. *Bivins v. State*, 642 N.E.2d 928 (Ind.1995), *cert. denied*, 516 U.S. 1077, 116 S.Ct. 783, 133 L.Ed.2d

---

7. In his amended petition for post-conviction relief, Benefiel challenged the validity of Indiana's death penalty by lethal injection on Eighth Amendment cruel and unusual punishment grounds. (P–C.R. at 163; *see also* P–C.R. at 726.) Later, at a hearing on Benefiel's motion to correct error, Benefiel withdrew this challenge, and focused exclusively on his then newly raised argument that the lack of a detailed written protocol violates due process. (P–C.R. at 726.) He did not make this claim in either his original petition for post-conviction relief, (*see* P–C.R. at 65–

94), or in his Amendment to that Petition (*see* P–C.R. at 130–81).

8. Judicial intervention in the details of execution methods is by its nature highly restrained. *See, e.g., Bayh v. Resnover*, No. 49S00–9412–CV–1188 (Ind. Dec. 7, 1994) (dissolving trial court's orders (1) requiring Department of Correction to videotape execution, and (2) permitting convict choice not to wear hood during electrocution).

734 (1996). (5) The death penalty statute is not constitutionally infirm simply because it does not expressly state a burden of proof for mitigating circumstances. *See Matheney,* 688 N.E.2d at 902. (6) It is perfectly acceptable to incorporate guilt phase evidence into the penalty phase. *Woods,* 547 N.E.2d at 794. (7) Written findings of specific mitigating factors are not required of the jury. *Wrinkles v. State,* 690 N.E.2d 1156 (Ind.1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 148, 142 L.Ed.2d 121 (1998). And finally, (8) the Indiana death penalty statute *does* provide a meaningful appellate review of a death sentence. *Hough,* 690 N.E.2d at 277.

### Conclusion

Benefiel has not met the burden of proof imposed upon him when appealing the denial of post-conviction relief. We affirm the judgment of the post-conviction court.

DICKSON, SULLIVAN, SELBY, and BOEHM, JJ., concur.