# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 03-1968

BILL J. BENEFIEL,

*Petitioner-Appellant,*

v.

CECIL DAVIS,

*Respondent-Appellee.*

_____

**Appeal from the United States District Court
for the Southern District of Indiana, Terre Haute Division.
No. 00 C 057—Richard L. Young**, *Judge.*

_____

ARGUED DECEMBER 4, 2003—DECIDED JANUARY 30, 2004

_____

Before BAUER, EASTERBROOK, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* In 1988, Bill J. Benefiel was sentenced to death for murdering Delores Wells in Terre Haute, Indiana, in 1987. His conviction for the murder, as well as for criminal confinement, rape, and criminal deviant conduct, and his death sentence have been upheld by the Indiana Supreme Court both on direct appeal, *Benefiel v. Indiana*, 578 N.E.2d 338 (Ind. 1991), and on appeal from the denial of a postconviction motion, *Benefiel v. Indiana*, 716 N.E.2d 906 (Ind. 1999). He is now before us appealing the district court's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. We start with the facts, which curl the stomach and numb the mind.

The story of this gruesome crime begins with another victim, Alicia Elmore. On October 10, 1986, at approximately 7:30 in the evening, Elmore, who was then 17 years old, walked to a gas station two blocks from her home in Terre Haute, Indiana, to purchase soft drinks for her mother and brother. Her family did not hear from her again for 4 months.

During those months, Benefiel, who had abducted Elmore off the street, tortured and raped her repeatedly, 64 times before she stopped counting. At various times he stuffed clothing or toilet paper in her mouth and put duct tape over her eyes and mouth. For the first 2 months her eyes were glued shut. He fastened her to a bed, naked, with a chain around her neck. At times he handcuffed her to the side railing of the bed and tied her feet together with a rope. When she screamed he slapped her and cut her with a knife. He cut off one of her fingernails. He cut off some of her hair and told her he was putting it in a scrapbook with hair samples from other women he had raped. For the first months she was fed only baked potatoes and water and was not allowed to use the bathroom without his permission. At one point he stuck a gun in her vagina and forced her to have anal intercourse.

She was convinced escape was impossible because of his dogs, which she could hear from inside the house. In addition, of course, she was terrorized. Benefiel asked her whether she wanted to die quickly or slowly. When she said quickly, he said her death would be long and painful. She had no reason to doubt it.

About 10 weeks into her captivity, Elmore saw, for the first time, the house in which she was imprisoned. A few weeks later she was moved to another house across the street from the first one. In the second house, Benefiel again chained her to the bed and had sexual intercourse and oral sex with her. In this house she could hear the

police scanner, which Benefiel used to determine which houses he could burglarize.

About a month later, in January 1987, Elmore heard noises which indicated to her that someone else was in the house. It turned out to be Delores Wells. Elmore first saw Wells lying naked and handcuffed on a bed. She had tape over her eyes and paper towels stuffed in her mouth, which was then taped over. On February 4, while Elmore watched, Benefiel began beating Wells, first with his fist and then with an electrical cord. Another time, he cut Wells's hair and cut off her finger. He also told her she would die slowly.

On February 7 Benefiel left the house, and when he returned he was muddy from the waist down. He told Elmore that he had been digging a grave which was big enough for two people—she assumed for Wells and her. That day, Benefiel also made Elmore watch as he put super glue in Wells's nose and pinched it together. He then put toilet paper in her mouth and taped it shut. Wells began squirming, trying to breathe.

A little later Benefiel chained Elmore to her bed and left the house. When he returned about 2 hours later he told Elmore that he had killed Wells by tying her arms and legs to two separate trees. He then wrapped duct tape around her head until she died. To make sure she was dead he "popped" her neck. Then he buried her.

On February 11 Benefiel told Elmore that the police were coming. He pushed her into a crawl space above the ceiling and warned her not to make a sound. The police arrived with a search warrant. Benefiel first told them he did not know the person they were looking for, but a few minutes later he told them where Elmore was. When she was found she told the police, in Benefiel's presence, that she was in the house voluntarily, surely an unlikely story. Later, at a hospital, she told the police what had happened to her.

During the search of the house the police also discovered a mask, a post-hole digger, a rake, a shovel, a pocket knife, .22-caliber rifle shells, and rope.

On February 22 volunteers searching for Wells found her body under a freshly disturbed plot of ground. An autopsy revealed internal and external injuries to the anus and injuries to the vagina indicating a violent rape. The cause of her death was asphyxia. In the trash at Benefiel's home the police found duct tape which had hairs on it similar to the head, eyebrow, and eyelash hairs of Wells.

A jury trial on the many charges we mentioned earlier resulted in a bevy of convictions. The jury recommended the death penalty and the trial judge imposed it. As we said, Benefiel's conviction was upheld by the Indiana Supreme Court. He then filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, asking the federal district court to set aside his conviction and death sentence. The petition was denied. In this appeal from that denial, he contends that the stress of the trial caused him to became incompetent to aid in his own defense. He also claims that he was deprived of the effective assistance of counsel because his attorney at trial and on direct appeal did not argue that the judge's instructions to the jury in the penalty hearing included an unconstitutionally narrow definition of mitigation and that, in announcing the sentence, the judge used the same overly narrow definition. Benefiel also says he was denied the effective assistance of trial counsel because his attorneys failed to move to suppress testimony of two women who said that Benefiel raped them years earlier, testimony which the trial court relied on as aggravating factors in support of the decision to impose the death penalty.

Because Benefiel's petition for a writ of habeas corpus was filed after April 24, 1996, the provisions of the Anti-terrorism and Effective Death Penalty Act of 1996 govern

our analysis. With respect to a claim that was adjudicated on the merits in state court, we may not grant a writ unless the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). In the latter determination, a factual issue "made by a State court shall be presumed to be correct" and the "applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). *See Williams v. Taylor*, 529 U.S. 362 (2000).

We turn first to the issue of Benefiel's competency to aid in his own defense. It is well-settled that a defendant may not be tried unless he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and . . . a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960); *see also Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996).

In Benefiel's case, two competency hearings had been held prior to trial. Each time, Benefiel was found to be competent. The issue arose for the third time during Benefiel's testimony near the end of the guilt phase of the trial. As his testimony began he was asked about his unfortunate childhood, including sexual abuse at the hands of one of his adoptive mother's boyfriends. Benefiel showed reluctance to answer the questions. He said to his attorney, "I thought you wasn't even going to ask me that." The lawyer said he did not promise not to ask and said, "We need to hear about it . . . ." Benefiel answered, "Yeah, but they will put it in the paper." He also testified about refusing to go to school because he thought everyone was laughing at him. There are other similar instances of Benefiel's apparent reluctance to testify or his avoidance of situations he doesn't like.

Then the questioning reached the matter of Alicia Elmore. Benefiel said, "That's a hard one to talk about." His testimony began with his version of the story. He said he was helping her out, letting her stay with him to avoid her unpleasant home situation. He testified briefly about taking her to a hospital in Vincennes. (She in fact did go to a hospital because she was bleeding vaginally. She used the name Mary Benefiel and did not cry out for help because she said she was afraid Benefiel would kill someone.) Then the judge called a recess, after which Benefiel refused to resume the stand. This caused a bit of consternation for all involved. The prosecutor said in this situation he was "a little limited" as to cross-examination. The judge replied, "That's putting it mildly." There was a natural concern that, as the judge said, "he gets up and testifies to what he wants and then refuses to answer any questions on it." After considerable discussion of the situation and also of what explanation to give the jury for Benefiel's absence from the courtroom, it was agreed that another hearing as to Benefiel's competency would be held. At this mid-trial hearing, Dr. Stephen Stewart, a clinical psychologist, testified essentially that Benefiel was not malingering and that he was not competent to continue with the trial. Dr. Stewart's view was that the trial was an extremely stressful and traumatic experience for Benefiel, and his usual coping skills of dissociating from what was going on around him proved to be inadequate during his testimony. On cross-examination, Dr. Stewart was asked whether he found it significant that when Elmore and two other rape victims pointed at Benefiel as their assailant, he smiled. He did; he thought it might be expected of the perpetrator of the crimes but not of the person who was testifying.

One of the defense attorneys also testified regarding his interaction with Benefiel after what he described as his "mental breakdown." Finally, Benefiel himself testified,

basically repeating that he could not go back into the courtroom.

The judge, who had been observing Benefiel for several days at this point, most likely would draw one of two conclusions. The first would be that Benefiel, who, we remember, had previously twice been found competent to stand trial, had suffered some sort of breakdown during his testimony which rendered him unfit to proceed. The second would be that Benefiel was trying to have the best of both worlds. He could testify about his pathetic upbringing and show the jury, by his reluctance to talk about it, how painful it was, but at the same time avoid going into detail about Elmore or Wells. And perhaps most importantly, he could avoid cross-examination.

The trial judge knew manipulation when he saw it. He said he believed Benefiel could make a decision to go into the courtroom and testify or not. In other words, he did not think Benefiel was unable to enter the courtroom but was choosing not to. The judge continued:

> The fact that he chooses not to be in there at this particular stage makes sense logically from some standpoints. For one thing, he was yet to face cross-examination in his testimony, and two, he had really not gotten to the parts of the story which could work to his disadvantage, this is how [he] portrayed his background which would create some sympathy, and we took the break right about the time we got to the Alicia Elmore section and did not get into Delores Wells. There seems to me to be some logical connection there which would justify perhaps as the Prosecutor has suggested, there is some manipulative action going on here.

Tr. at 2552-53. The Indiana Supreme Court found the trial judge's decision to be supported by the record.

Benefiel urges us to find that the state court's finding that he was competent was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The argument is based in large part on a contention that the only evidence which was before the judge supported Benefiel's claim. Were we to accept that argument, we would be taking from the judge the ability to assess the credibility and persuasiveness of the evidence. This trial judge was not convinced by the evidence presented. Relying on his own observation, as well as the testimony of psychological experts from the earlier hearings, he was convinced that nothing had changed and that Benefiel remained competent to stand trial. We cannot say that the decision of the Indiana Supreme Court upholding that determination was unreasonable in any way.

Benefiel also alleges that he was denied the effective assistance of counsel at both his trial and on appeal to the Indiana Supreme Court. Both claims involve the trial judge's understanding of mitigation as revealed in his sentencing decision and in the jury instructions. To understand why there are two claims which seem to go to the same perceived problem, one must remember that in Indiana at the time, in the penalty phase of the proceeding, the jury issued a recommendation as to whether the death penalty should be imposed. Its recommendation, however, was advisory, not binding. It was the judge who bore the final burden of imposing a death sentence. Indiana Code § 35-50-2-9(e)(2).[1] Benefiel claims that his trial attorneys were incompetent for not objecting to the jury instructions

---

[1]  At the time, the statute read, "The court shall make the final determination of the sentence, after considering the jury's recommendation, and the sentence shall be based on the same standards that the jury was required to consider. The court is not bound by the jury's recommendation."

and that his attorneys were incompetent at both the trial and on appeal for not arguing that the sentencing judge applied an unconstitutionally narrow definition of mitigation in evaluating whether to impose the death sentence.

The well-established legal principles that govern claims of ineffective assistance of counsel are set out in *Strickland v. Washington*, 466 U.S. 668 (1984). An ineffective assistance claim has two components. First, a petitioner must show that counsel's performance was deficient. Secondly, he must show that the deficiency prejudiced his defense. To establish deficient performance, a petitioner must demonstrate that the representation "fell below an objective standard of reasonableness." At 688. The Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Wiggins v. Smith*, 123 S. Ct. 2527, 2535 (2003), quoting *Strickland*, 466 U.S. at 688. To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

It was the *Strickland* standard on which the Indiana Supreme Court relied. As to the jury instructions, the court was "satisfied that a lawyer performing reasonably well could decide the instructions as a whole gave the jury an adequate picture of its role and take a pass on objecting to this particular instruction." *Benefiel,* 716 N.E.2d at 914. We cannot conclude that this finding was "contrary to, or involved an unreasonable application of" *Strickland* or of various Supreme Court cases analyzing jury instructions, particularly instructions on mitigation.

The instruction to which Benefiel objects is "[m]itigating is defined as a fact or circumstance which makes an offense appear less severe." Benefiel argues that the instruction is unconstitutional in that it impermissibly limited the jury's consideration of mitigating evidence to the circumstances surrounding the offense. In other words, he contends that it indicated that the only relevant mitigating evidence was that which could, for instance, justify his actions in committing the offense. There was, he argues, a reasonable likelihood that the jury applied the challenged instruction in a way that prevented consideration of relevant mitigating evidence, such as his difficult childhood.

The scope of mitigation is also the basis of his claim that counsel at both his trial and on appeal were incompetent for failing to raise the issue that his Eighth Amendment rights were violated at sentencing because the judge himself applied an unconstitutionally narrow definition of mitigation in evaluating whether to sentence Benefiel to death.

In support of his argument, Benefiel calls our attention to *Eddings v. Oklahoma*, 455 U.S. 104 (1982). In that case, the sentencing judge stated that he would not consider in mitigation the circumstances of Eddings' unhappy upbringing and emotional disturbance. The Court said that the sentencer may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence." At 114 (emphasis in original).

It is a long step from what happened in *Eddings* to what happened here. We will look at the jury instruction first. The jury instruction at issue is a single sentence from the entire charge to the jury. But we do not evaluate a single sentence in isolation. It is well-established that a "single instruction to the jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Boyd v. United States*, 271 U.S. 104, 107 (1926);

*Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973). The instructions must be such that the jury is not precluded from giving effect to the mitigating evidence. *Weeks v. Angelone*, 528 U.S. 225 (2000). When we look to the instructions as a whole, we do not find that the instructions unconstitutionally limit the jury's consideration of mitigating evidence.

The jury was instructed that

> [t]he law provides that you may also consider the following mitigating circumstance:  The defendant:  1. has no significant history of prior criminal conduct; 2. was under the influence of extreme mental or emotional disturbance when he committed the murder; 3. defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease or defect; 4. any other circumstances appropriate for consideration.

The sentence Benefiel objects to was part of an instruction which stated in full:

> Mitigating is defined as a fact or circumstance which makes an offense appear less severe. So, even though a mitigating circumstance does not constitute a justification of or excuse for the offenses in question, it should, in the interests of fairness and mercy, be considered as reducing Bill J. Benefiel's moral culpability.

The jury was also told, "You may consider all the evidence introduced at the trial, together with any new evidence presented at this hearing."

The hearing included evidence from a jailer at the jail where Benefiel was held prior to trial. He testified that Benefiel suffered mood swings in jail and was suicidal. It included testimony from Benefiel's birth mother, Norma Gilley, who testified that she gave Bill away at birth to a

basically unfit mother in exchange for a place to stay. Although she knew the adoptive mother, Gilley showed no interest in Benefiel's life or in whether one of the adoptive mother's boyfriends was abusing him. She knew about his trial on these charges but did not voluntarily come forward to help. She testified on Benefiel's behalf only because she was subpoenaed by his attorney. There was testimony from Marilyn Benefiel, the petitioner's wife, who described mood swings and outbursts of violence. She also testified that she planned to stay married to Benefiel and that their three children loved him. In addition, all of the evidence from trial, including that from psychologists, was incorporated into the penalty hearing. Furthermore, counsel said in closing argument that mitigating circumstances "have to do with whether or not you think that the defendant's mental state or mental disease or whatever mental problems he has, give him not an excuse, not a justification, but give him a reason to expect some mercy in the decision you are about to make."

When we view the instructions as a whole and the evidence which the instructions notify the jury they can consider, we think that, as in *Boyde v. California*, 494 U.S. 370, 381 (1990), "there is not a reasonable likelihood that [the] jurors interpreted the trial court's instructions to prevent consideration of mitigating evidence of background and character." In *Boyde*, the defendant had objected to an instruction which listed 11 examples of mitigating evidence, all but one of which focused on the specific crime at issue or on prior criminal activity. Boyde contended that the remaining provision, a so-called catch-all provision, "did not allow the jury to consider and give effect to non-crime-related mitigating evidence, because its language— '[a]ny other circumstance which extenuates the gravity of the crime'—limited the jury to other evidence that was *related to the crime*." At 378 (emphasis in original).

The Court disagreed. The instruction at issue allowed the petitioner to argue that his background and character extenuated or excused the seriousness of the crime. Further, the jury was instructed to consider any other circumstance that might excuse the crime, which would include his background and character. The Court also found that the "context of the proceedings would have led reasonable jurors to believe that evidence of petitioner's background and character could be considered in mitigation." *Boyde*, 494 U.S. at 383.

Given the entire picture which emerges on this issue, we cannot find that the Indiana Supreme Court's conclusion that counsel "performing reasonably well could decide the instructions as a whole gave the jury an adequate picture of its role . . ." and that therefore the representation was not deficient is an unreasonable application of *Strickland*.

We reach the same conclusion when we look at the sentencing proceeding and the judge's understanding of mitigating circumstances. In addition to the evidence in mitigation that the jury heard, the judge also heard from Elmore, Wells's parents, and Wells's husband. All four testified that they did not want Benefiel to be sentenced to death. They wanted him to remain alive in prison and to have to confront daily what he had done. Death, in the words of Elmore, was the "easy way out."

After hearing from the victims, the judge first went through the statutory mitigating factors, finding that none of them applied. He then considered Benefiel's mistreatment while he was young and referred to Benefiel's background. But ultimately he concluded that there was "no excuse or justification to explain or mitigate against these incomprehensible acts . . . ." He said, not without justification, that to "weigh the aggravating factor against any possible mitigating factors in this case is like as the old axiom goes, comparing a mountain to a molehill." While

there are phrases during the sentencing hearing that can be interpreted to limit the scope of mitigation, it is clear that the sentencing judge was aware that the evidence of childhood trauma and other psychological factors were, in fact, what mitigation was all about. It was simply that in his view those factors did not tip the scales when they were weighed against the aggravating factors. We cannot find that the failure to raise this issue violated the *Strickland* standard.

Benefiel's final claim is that his trial counsel was ineffective for failing to move to suppress statements from two women who testified that Benefiel had raped them 7 and 9 years earlier. A woman named Diana testified that a man wearing a black ski mask broke into her bedroom and stood over her bed. He was holding a gun. He asked her for money and then took her to another bedroom where he tied her to the bed with an electrical cord. He raped her and forced her to perform oral sex on him. After these acts, her assailant took off his mask and she saw his face. No one was ever charged with the crime but, during the present trial, Diana testified that the man who raped her was Benefiel. The second witness was Mary, who testified that she was walking across a parking lot when a man wearing a nylon mask and carrying a gun grabbed her. She also was raped, tied up, and put into a shed. Later the assailant put her in the trunk of his car. When he took her out of the trunk he raped her again. He then put putty in her eyes and taped over the putty. She was raped again. At one point the putty slipped from her eyes and she saw the assailant, who had removed his mask. She positively identified Benefiel.

In evaluating this evidence, the Indiana Supreme Court concluded that under Indiana law it was admissible to show a "common scheme or plan." The court also found that the attacks were not too remote in time to be admissible. Given that the testimony was found to be admissible, counsel

cannot be faulted for failing to register a futile objection. Benefiel was not prejudiced by the failure to object.

For all these reasons, the judgment of the district court denying Benefiel's petition for a writ of habeas corpus is AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*