## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 12 2015, 9:30 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Scott L. Barnhart
Keffer Barnhart LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Maria Martha Caceres,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

August 12, 2015

Court of Appeals Case No. 36A01-1412-CR-518

Appeal from the Jackson Circuit Court

The Honorable Richard W. Poynter, Judge

Cause No. 36C01-1306-FB-22

**Brown, Judge.**

[1] Maria Martha Caceres ("Caceres") appeals her convictions for battery as a class B misdemeanor and neglect of a dependent resulting in serious bodily injury, a class B felony. Caceres raises two issues which we revise and restate as:

I. Whether the trial court properly instructed the jury; and

II. Whether the evidence is sufficient to support her convictions.

We affirm.

### Facts and Procedural History

[2] Caceres and her husband, Luis Caceres ("Luis"), are the parents of D.C., born on March 9, 2012. Luis was frequently away from home for work, and Caceres was the primary caregiver for D.C. At his regularly scheduled infant assessments, D.C.'s pediatrician, Dr. Courtney Kleber, noted that he was doing well, his demeanor and extremities were normal, and he showed no signs of mistreatment. On November 7, 2012, Dr. Kleber saw D.C. for an ear infection, but, despite the ear infection, he was "acting okay . . . and . . . sleeping okay." Transcript at 38. Dr. Kleber started D.C. on an antihistamine out of concern that some of the symptoms he was experiencing at that time were caused by allergies.

[3] On November 30, 2012, Caceres took D.C. to Schneck Medical Center ("Schneck") due to concern about his respiratory issues. While being treated at Schneck, D.C. had a chest x-ray taken. The radiologist's report concerning the

x-ray stated that "[a] small infiltrate or pneumonia is not excluded" and that the x-ray was an "[o]therwise unremarkable exam." State's Exhibit 1.

[4] On December 17, 2012, D.C. was again seen by Dr. Kleber, who discovered a bump on his right clavicle called a callus[1] during his regularly scheduled "nine month well-check." Transcript at 39. Dr. Kleber then sent D.C. to Schneck to have an x-ray taken of his clavicle, which was taken later that day. That x-ray revealed an oleo fracture[2] of the right clavicle, and the report accompanying the x-ray noted that "a fracture involving the proximal right humerus is difficult to exclude," State's Exhibit 1, because the humerus was "not well evaluated" on that x-ray. Transcript at 48. The radiologist's report on the x-ray exam concluded by stating "[n]on-accidental trauma" was not excluded as a cause of the clavicle fracture. State's Exhibit 1.

[5] On December 18, 2012, Dr. Kleber called Caceres to discuss the results of the x-ray. Caceres was tearful and cooperative, and Dr. Kleber noted that "she was being very appropriate for finding out that her child had, uh, another broken bone." Transcript at 78. Dr. Kleber had Caceres return D.C. to Schneck that day for an x-ray of his right humerus, which revealed a fracture that "look[ed] like that it had been there a while." *Id.* at 49. On December 19, 2012, Caceres

---

[1] Callus is defined as "[n]ew growth of incompletely organized bony tissue surrounding the bone ends in a fracture; a part of the reparative process." BLACKISTON'S GOULD MEDICAL DICTIONARY 214 (Alfonso R. Gennaro, et al. eds., 4th ed. 1979).

[2] Dr. Kleber testified that "it's called a[n] oleo fracture because of the callus formation that's there." Transcript at 48.

had an in-person follow-up appointment with Dr. Kleber to discuss the x-rays, during which Dr. Kleber discussed the possibility that D.C. had a bone malignancy. Dr. Kleber also told Caceres that she had arranged for D.C. to have a long bone survey and an appointment with a pediatric orthopedic surgeon at St. Vincent's Hospital in Indianapolis.

[6] On December 20, 2012, D.C. was examined by Dr. Courtney Demetris, a pediatric hospitalist and a member of the Child Abuse Review Team at the Peyton Manning Children's Hospital at St. Vincent's in Indianapolis. After reviewing the results of the long bone survey, Dr. Demetris confirmed that D.C. had a transverse fracture of the right clavicle and right humerus, and also discovered that he had a spiral fracture of the left humerus. Dr. Demetris then conducted additional testing to "look into what was going on with [D.C.] medically," which included another full long bone survey conducted two weeks later. *Id.* at 101. After reviewing the results of the various tests performed on D.C., Dr. Demetris concluded that he had "normal bones." *Id.* at 121. Dr. Demetris's diagnosis was "[n]on-accidental trauma, or child abuse." *Id.* at 111.

[7] On December 20, 2012, Indiana State Police Detective Richard Roseberry was assigned to investigate the potential child abuse. He first gathered information from the nurses and doctors at the hospital, and then proceeded to interview Caceres and Luis, who provided him with the names of all the people with whom D.C. had contact. At this time, Caceres expressed no concern that any of these people or Luis were harming her child. After conducting an

investigation into the other people with whom D.C. had contact, Detective Roseberry scheduled a follow-up interview with Caceres for March 4, 2013.

[8] On March 4, Caceres was interviewed by Detective Sergeant Delmer Gross, and then by Detective Roseberry. Over an hour after her interview began, Detective Roseberry stated "you got pressed to your breaking point, and you broke. And, [D.C.]'s injuries are the result," which was followed by the question "[w]ould, would you agree to that fact?" State's Exhibit 3(A) at 1:27:55; State's Exhibit 3(B) at 25. Caceres sighed and responded "yeah." State's Exhibit 3(A) at 1:28:15; State's Exhibit 3(B) at 25. Caceres went on to say "it only happened when I got really, really frustrated with him . . . ." State's Exhibit 3(A) at 1:29:10; State's Exhibit 3(B) at 26.

[9] On June 14, 2013, the State charged Caceres with battery resulting in serious bodily injury to a person less than fourteen years old, a class B felony, and neglect of a dependent resulting in serious bodily injury, a class B felony. On October 16, 2014, a jury trial was held.

[10] At trial, when asked her opinion on the approximate date the injuries occurred to D.C., Dr. Demetris stated that she had reviewed the x-ray taken on November 30, 2012, and had concluded that the fracture of D.C.'s clavicle was visible in that x-ray. In addition, she had reviewed the first and second long bone survey to assess the state of repair in D.C.'s bones, and, by doing so, she was able to estimate the date of injury. She noted that no healing process had yet started at the time of the November 30 x-ray, which indicated to her that

those fractures were "days, or less than a week or so old" at that time. Transcript at 114. She testified that, by comparing the initial x-ray to the follow-up x-rays, the fractures had occurred within a week of November 30, 2012.

[11] When asked about the potential mechanisms for such injuries, Dr. Demetris testified that "typically it takes quite a bit of force to break [humerus] bones in an infant," but that she could not say exactly what happened to cause the fractures. *Id.* at 116. She also testified that these kinds of injuries "do not occur with normal infant handling," that D.C. would have been in extreme pain, and that, because the fractures went untreated, his bones would have been "grinding on the other ends of the bones," which is "incredibly painful." *Id.* at 120-121, 126. When she was asked how the person that created the injuries would know that D.C. was seriously injured, Dr. Demetris responded that "the amount of force that would of [sic] been required to have been applied to the bones of [D.C.], to have resulted in these fractures, would have been recognized as excessive by any reasonable caregiver," that D.C. would have had "significant crying and outcry," and that he would not have been using his arms. *Id.* at 131-132. Dr. Demetris testified that during the December 20, 2014 hospital visit D.C.'s parents had confirmed to her that he was not crawling or using his arms "around the few days of the thirtieth into the next several days." *Id.* at 133.

[12] After the State rested its case-in-chief, the parties and the court discussed final jury instructions, including Caceres's Proposed Final Instruction No. 3, which read:

Some of you have heard the phrases "circumstantial evidence" and "direct evidence."

Direct evidence is the testimony of someone who claims to have personal knowledge of the commission of the crime which has been charged, such as an eyewitness. Circumstantial evidence is the proof of a series of facts which tend to show whether the accused is guilty or not guilty. The law makes no distinction between the weight to be given either direct or circumstantial evidence. You should decide how much weight to give any evidence. All the evidence in this case, including the circumstantial evidence, should be considered by you in reaching your verdict.

However, circumstantial evidence alone will not justify a finding of guilty unless the circumstances are entirely consistent with the Accused's guilt, wholly inconsistent with any reasonable theory of the Accused's innocence, and are so convincing as to exclude a reasonable doubt of the Accused's guilt.

Appellant's Appendix at 44. Although the trial court stated that it was going to read the first two paragraphs of this instruction, but not the third, the following instruction on circumstantial evidence was ultimately read to the jury:

The parties of this case may prove a fact by one or, by one of two types of evidence. Direct evidence or circumstantial evidence. Direct evidence is direct proof of a fact. Circumstantial evidence [is] an indirect proof of a fact. For example, direct evidence that an animal ran in the snow might be the testimony of someone who actually saw the animal run in the snow. On the other hand, circumstantial evidence that animal ran in the snow might be the testimony of someone who saw the animal's tracks in the snow. It is not necessary that any fact be proved by direct evidence. You may consider both direct evidence and circumstantial evidence as proof.

Transcript at 282-283.

[13] On October 15, 2014, a jury found Caceres guilty of the lesser included charge of battery as a class B misdemeanor, and neglect of a dependent resulting in serious bodily injury, a class B felony. On November 17, 2014, the court sentenced Caceres to 180 days for battery as a class B misdemeanor. The court sentenced Caceres on the neglect conviction to ten years with four years suspended to probation. The court ordered that Caceres serve her first two years in the appropriate penal facility followed by four years on home detention as a direct placement supervised through the Jackson Jennings Community Corrections Department. The court ordered that the sentences be served concurrent with each other.

## Discussion

## I.

[14] The first issue is whether the court abused its discretion in instructing the jury. Generally, "[t]he purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict." *Overstreet v. State,* 783 N.E.2d 1140, 1163 (Ind. 2003), *cert. denied,* 540 U.S. 1150, 124 S. Ct. 1145 (2004). Instruction of the jury is generally within the discretion of the trial court and is reviewed only for an abuse of that discretion. *Id.* at 1163-1164. When reviewing the refusal to give a proposed instruction, this court considers: (1) whether the proposed instruction correctly states the law; (2) whether the evidence supports giving the instruction; and (3) whether other instructions already given cover the substance of the proposed instruction.

*Driver v. State,* 760 N.E.2d 611, 612 (Ind. 2002). To constitute an abuse of discretion, the instruction given must be erroneous, and the instructions taken as a whole must misstate the law or otherwise mislead the jury. *Benefiel v. State*, 716 N.E.2d 906, 914 (Ind. 1999), *reh'g denied*, *cert. denied*, 531 U.S. 830, 121 S. Ct. 83 (2000).

[15] Before a defendant is entitled to a reversal, she must affirmatively show that the erroneous instruction prejudiced her substantial rights. *Lee v. State*, 964 N.E.2d 859, 862 (Ind. Ct. App. 2012) (citing *Gantt v. State*, 825 N.E.2d 874, 877 (Ind. Ct. App. 2005)), *trans. denied*. An error is to be disregarded as harmless unless it affects the substantial rights of a party. *Id.* (citing *Oatts v. State*, 899 N.E.2d 714, 727 (Ind. Ct. App. 2009); Ind. Trial Rule 61).

[16] Caceres argues that the trial court erred by determining that the State had presented direct evidence of the *actus reus* element of the charged crimes and by failing to provide an instruction on a "reasonable hypothesis of innocence." In *Hampton v. State*, 961 N.E.2d 480, 484-491 (Ind. 2012), the Indiana Supreme Court discussed the circumstances under which a defendant is entitled to, and required to receive, a "reasonable hypothesis of innocence" instruction in regards to circumstantial evidence. The Court stated that such an instruction "is appropriate only where the trial court finds that the evidence showing that the conduct of the defendant constituting the commission of a charged offense, the *actus reus,* is proven exclusively by circumstantial evidence." 961 N.E.2d at 490. Additionally, the Court stated:

> [W]e find it inappropriate to include language burdening the jury with the task of deciding whether to apply the reasonable theory of innocence standard. Whether an instruction is supported by the evidence is a matter for the trial court to determine, and it need not be reevaluated by the jury.

*Id.* Thus, where there is any direct evidence of the *actus reus* of the charged offense, as determined by the court, a "reasonable hypothesis of innocence" instruction is inappropriate. *See id.* The Court's discussion on direct and circumstantial evidence in *Hampton* provided:

> Direct evidence is "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *Black's Law Dictionary* 636 (9th ed. 2009). Conversely, circumstantial evidence is "[e]vidence based on inference and not on personal knowledge or observation." *Id.* Indiana case law has expressed it thusly: "Direct evidence means evidence that directly proves a fact, without an inference, and which in itself, if true, conclusively establishes that fact. Circumstantial evidence means evidence that proves a fact from which an inference of the existence of another fact may be drawn." *Gambill* [*v. State*], 675 N.E.2d [668,] 675 [(Ind. 1996), *reh'g denied*].

*Id.* at 489.

[17]   Caceres argues that there was no direct evidence of either of the charged crimes, and that a "reasonable hypothesis of innocence" instruction was required under *Hampton*. While discussing the proposed jury instructions, the trial court stated that "this is not a completely circumstantial evidence case . . . ." Transcript at 195. We agree. Caceres's admission that she was the cause of D.C.'s injuries constitutes direct evidence of the act element of both the battery and neglect charges, because it speaks to whether she touched D.C. in a rude, insolent, or

angry manner and whether she placed him in a situation that endangered his health. *See Carr v. State*, 728 N.E.2d 125, 131 (Ind. 2000) (holding that the trial court properly refused the defendant's tendered instruction dealing with circumstantial evidence because a defendant's confession of guilt to another person is direct evidence and a witness testified that the defendant had told her shortly after the time of the murder that he had "hurt and choked" the victim); *Clemens v. State*, 610 N.E.2d 236, 244 (Ind. 1993) (plurality opinion) (finding that a defendant's admission that he was present when the victim sustained his injuries constituted direct evidence), *reh'g denied*. Accordingly, the trial court was not required to issue a jury instruction regarding a "reasonable hypothesis of innocence." *See Hampton*, 961 N.E.2d at 490. Therefore, we conclude that the trial court's decision not to provide such an instruction did not prejudice Caceres's substantial rights, and that the trial court did not abuse its discretion.[3]

## II.

[18] The next issue is whether the evidence is sufficient to support Caceres's convictions. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Gray v. State*, 903

---

[3] To the extent that Caceres argues the jury's verdicts are inconsistent and thus demonstrate the possibility that it misunderstood the instructions given to it, we note that the Indiana Supreme Court has acknowledged that this is one possible interpretation of such verdicts. *See Beattie v. State*, 924 N.E.2d 643, 648 (Ind. 2010) ("When a jury returns logically inconsistent verdicts, such a result could mean that it misunderstood its instructions."). However, "it is more likely that the jury chose to exercise lenity, refusing to find the defendant guilty of one or more additionally charged offenses, even if such charges were adequately proven by the evidence. Such right of a criminal jury to decline to convict is well recognized." *Id.* (citations omitted).

N.E.2d 940, 943 (Ind. 2009). Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of probative value and reasonable inferences drawn from that evidence upon which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*

[19] The offense of battery as a class B misdemeanor is governed by Ind. Code § 35-42-2-1,[4] which at the time of the offense provided that "[a] person who knowingly or intentionally touches another person in a rude, insolent, or angry manner commits battery, a Class B misdemeanor." Caceres argues that there is no evidence she battered her child.

[20] Looking at the evidence most favorable to the battery verdict, the record reveals that Caceres admitted to having been the cause of D.C.'s injuries, and that she caused those injuries because she was frustrated with her child. Furthermore, Dr. Demetris testified that D.C.'s injuries would not have been caused by "normal infant handling," that it would have taken "quite a bit of force" to break the humerus bones of an infant, that the force required to cause such injuries "would have been recognized as excessive by any reasonable caregiver," and that his injuries were caused by "non-accidental trauma, or child abuse." Transcript at 111, 116, 120-121, 131. Based upon the record, we conclude that the State presented evidence of a probative nature from which a

---

[4] Subsequently amended by Pub. L. Nos. 158-2013, § 420 and 147-2014, § 2 (eff. July, 1 2014).

reasonable trier of fact could have found that Caceres committed battery as a class B misdemeanor beyond a reasonable doubt.

[21] We turn next to Caceres's argument that the evidence is not sufficient to support her conviction for neglect of a dependent resulting in serious bodily harm, because she was not aware of a high probability that D.C. needed medical care. The offense of neglect of a dependent resulting in serious bodily injury is governed by Ind. Code § 35-46-1-4,[5] which at the time of the offense provided:

> (a) A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally:
>
>> (1) places the dependent in a situation that endangers the dependent's life or health;
>>
>> * * * * *
>
> commits neglect of a dependent, a class D felony.
> (b) However, the offense is:
>
>> * * * * *
>>
>> (2) a Class B felony if it is committed under subsection (a)(1), (a)(2), or (a)(3) and results in serious bodily injury; . . . .

---

[5] Subsequently amended by Pub. L. No. 193-2013, § 6 (eff. July 1, 2013) and Pub. L. Nos. 158-2013, § 550 and 168-2014, § 85 (eff. July 1, 2014).

"Serious bodily injury" is defined by Ind. Code § 35-31.5-2-292,[6] which, in relevant part, provides that "'[s]erious bodily injury' means bodily injury that creates a substantial risk of death or that causes: . . . (3) extreme pain; . . . ."

[22] The evidence most favorable to Caceres's conviction for neglect of a dependent resulting in serious bodily injury includes her admission that she caused D.C.'s injuries and Dr. Demetris's testimony that the force required to cause D.C.'s fractures "would have been recognized as excessive by any reasonable caregiver," that D.C. would have had "significant crying and outcry," that he would have been in extreme pain because his bones would have been "grinding on the other ends of bones," that Caceres confirmed to her that he was not crawling or using his arms "around the few days of the thirtieth into the next several days," and that Caceres did not seek medical treatment for the fracture injuries to D.C. until Dr. Kleber noticed the callus on his clavicle more than two weeks after the injuries occurred. Transcript at 126, 131-133. Based upon the record, we conclude that the State presented evidence of a probative nature from which a reasonable trier of fact could have found that Caceres committed neglect of a dependent resulting in serious bodily injury beyond a reasonable doubt.

## Conclusion

[23] For the foregoing reasons, we affirm Caceres's convictions.

---

[6] As added by Pub. L. No. 114-2012, § 67 (Eff. July 1, 2012).

Affirmed.

Friedlander, J., and Riley, J., concur.